UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SALLY A. RANDALL,                              )
RONA C. PEPMEIER,                              )
JULIE M. IRISH,                                )
Individually and on Behalf of all Others       )
Similarly Situated,                            )
                                               )
                    Plaintiffs,                )
                                               )        Cause No.: 1:06-CV-0860-SEB-JMS
          v.                                   )
                                               )
ROLLS-ROYCE CORPORATION,                       )
ROLLS-ROYCE NORTH AMERICA, INC.,               )
ROLLS-ROYCE NORTH AMERICA                       )
HOLDINGS, INC., and                            )
ROLLS-ROYCE NORTH AMERICA                       )
(USA) HOLDINGS, CO.,                           )
                                               )
                    Defendants.                )

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PROTECTIVE ORDER
TO QUASH PLAINTIFFS' RULE 30 (b)(6) DEPOSITION NOTICE AND TO
<u>PRECLUDE THE DEPOSITIONS OF CURRENT AND FORMER EMPLOYEES</u>**

Defendants Rolls-Royce Corporation, Rolls-Royce North America, Inc., Rolls-Royce

North America Holdings, Inc., and Rolls-Royce North America (USA) Holdings Co.

("Defendants"), submit the following brief in support of their Motion for Protective Order to

Quash Plaintiff's Notice of Rule 30(b)(6) Deposition and to preclude the depositions of

Defendants' current and former employees.

## I. Introduction

Two weeks before the expiration of discovery and twenty-months of litigation after filing

this lawsuit, Plaintiffs have served a Rule 30(b)(6) Deposition Notice requiring Defendants to

produce one or more corporate representatives who can testify about 20 separate topics and 40

additional subtopics canvassing virtually every issue in this lawsuit.  Additionally, Plaintiffs also

demand that Defendants produce seven current and former employees for deposition -- all before the expiration of discovery on February 29, 2008.   Plaintiffs' request to conduct multiple depositions at this late date is completely unreasonable -- particularly given their history of dilatory conduct in this case.   Defendants should not be forced to scramble at the eleventh-hour by rearranging their schedules, locating appropriate witnesses, familiarizing witnesses with 35,000 pages of discovery documents, preparing witnesses for depositions and requiring witnesses -- some of whom are outside of the United States -- to attend depositions over an accelerated two week period simply to accommodate Plaintiffs' failure to properly manage discovery in this matter.   Plaintiffs could have requested to take these depositions at any point during the twenty months that this case has been pending.   Their last-minute attempt to take depositions -- particularly of the expansive nature sought by Plaintiffs -- at this juncture is unreasonable and unfairly burdensome to Defendants.   Accordingly, the Court should quash Plaintiff's Rule 30(b)(6) Deposition Notice and should preclude the depositions of Defendants' current and former employees.

## II.   Procedural History

Plaintiffs, Sally A. Randall, Rona Pepmeier, and Julie Irish[1] ("Plaintiffs") filed this employment-discrimination lawsuit -- characterizing it as a class action -- against Defendants on May 24, 2006.   Thereafter, the Court approved the parties' Case Management Plan, and established a non-expert discovery deadline of October 26, 2007.   [Doc. #24, p. 5].

The parties have engaged in extensive discovery in this matter.   Plaintiffs served written discovery on Defendants -- including 51 separate requests for production -- on January 26, 2007. In response, Defendants have produced more than 9,083 responsive documents (containing more

---

[1] Plaintiffs have requested that Julie Irish be dismissed as a Plaintiff from this matter.   [Doc. #68].

than 35,000 pages) to Plaintiffs. Defendants similarly conducted written discovery and also completed the individual Plaintiffs' depositions on January 3 and 4, 2007, and February 16, 2007.

Throughout the twenty months that this matter has been pending, Plaintiffs' discovery efforts have been limited to written discovery. Until the Notice that precipitated this Motion, Plaintiffs did not serve Defendants with any Notices of Deposition and never discussed the scheduling of any depositions. Instead, Plaintiffs have focused their attentions on extending the deadline to file their Motion For Class Certification.

On August 28, 2007, the Court granted Plaintiff's Third Motion for Enlargement of Time to File Motion for Class Certification, but cautioned that Plaintiffs have a duty to "diligently prosecute the case" and therefore, limited the extension from the five months requested by Plaintiffs to "January 4, 2008, with no further extensions." [Doc. #52]. Over three months later, on December 3, 2007, the Court revisited this issue and -- based in part on the volume of the discovery material that had been produced -- extended the deadline for Plaintiffs to file their Motion for Class Certification to April 1, 2008. [Doc. #63]. At the same time, the Court also extended the non-expert discovery period to February 29, 2008. [*Id.*]. In its Entry, the Court expressly instructed the parties to "devote sufficient resources to the litigation to comply with the amended deadlines." [*Id.*].

Plaintiff's Third Motion for Enlargement of Time to File Motion for Class Certification, which was filed on *August 15, 2007*, indicated that Plaintiffs intended to "depose numerous corporate representatives of Defendants. [Doc. #48, ¶16.f.]. However, Plaintiffs did not notice a deposition or contact Defendants' counsel to discuss the scheduling of a deposition in either the months of August, September, October, November, or December 2007, or in January 2008.

Instead, on February 12, 2008, approximately **two-weeks** before the discovery deadline, Plaintiffs' counsel faxed a Notice of Deposition Pursuant to Rule 30(b)(6) to Defendants' counsel at 8:14 p.m. requesting that the deposition of Defendants' corporate representative be scheduled no later than February 29, 2008.[2]  [Notice of Deposition, Exhibit A].   Plaintiff's Notice of Deposition identified 20 separate topics and 40 discreet subtopics.  The following is a complete list of the issues that Plaintiffs intend to cover at the Rule 30(b)(6) deposition:

     a.     **Compensation Programs**

     1.     The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of Compensation programs including variations, if any, considered or implemented by Rolls-Royce;

     2.     Directives, instructions and explanations of the interpretation, implementation and enforcement of Compensation programs, including, but not limited to, the policies, practices and procedures intended to govern the Compensation, and variations, if any, at Rolls-Royce;

     3.     The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering Compensation;

     4.     Any evaluations of the impact on employees by gender, including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under Rolls-Royce's Compensation programs.

     b.     **Salary Programs and Policies**

     1.     The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of Salary programs and policies, including variations, if any, considered or implemented by Rolls-Royce;

     2.     Directives, instructions and explanations of the interpretation, implementation and enforcement of Salary programs and policies, including, but not limited to, the policies, practices and procedures intended to govern the Salary programs and policies, and variations, if any, at Rolls-Royce;

---

[2] Plaintiff proposed eight business days for the depositions: February 18 -- which is a Federal holiday -- February 19-22 and February 25-29, 2008.

3.    The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering Salary programs and policies;

4.    Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under Salary programs and policies.

c.    **Variable Compensation Policies**

1.    The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of Variable Compensation programs and policies, including variations, if any, considered or implemented by Rolls-Royce;

2.    Directives, instructions and explanations of the interpretation, implementation and enforcement of Variable Compensation policies, including, but not limited to, the policies, practices and procedures intended to govern the Variable Compensation programs and policies, and variations, if any, at Rolls-Royce;

3.    The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering Variable Compensation programs and policies;

4.    Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under Variable Compensation programs and policies.

d.    **Employee Benefit Plans**

1.    The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of Employee Benefit Plans, including variations, if any, considered or implemented by Rolls-Royce;

2.    Directives, instructions and explanations of the interpretation, implementation and enforcement of Employee Benefit Plans, including, but not limited to, the policies, practices and procedures intended to govern the Employee Benefit Plans, and variations, if any, at Rolls-Royce;

3.    The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering Employee Benefit Plans;

4.   Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under Employee Benefit Plans.

e.   **Requisitions**

1.   The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of the use of job requisitions to fill vacant positions, including variations, if any, considered or implemented by Rolls-Royce;

2.   Directives, instructions and explanations of the interpretation, implementation and enforcement of the use of requisitions to fill vacant positions, including, but not limited to, the policies, practices and procedures intended to govern requisition processes, and variations, if any, at Rolls-Royce;

3.   The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering the use of requisitions to fill vacant positions;

4.   Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under the use or non-use of requisitions to fill vacant positions.

f.   **Identification of Candidates or Slates of Candidates**, including the use of the Performance Appraisal or HRM Process, and similar evaluative activities to identify candidates or slates of candidates to fill vacant positions:

1.   The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of the processes to identify candidates or slates of candidates to fill vacant positions, including variations, if any, considered or implemented by Rolls-Royce;

2.   Directives, instructions and explanations of the interpretation, implementation and enforcement of the processes to identify candidates or slates of candidates to fill vacant positions, including, but not limited to, the policies, practices and procedures intended to govern these processes, and variations, if any, at Rolls-Royce;

3.   The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering the processes to identify candidates or slates of candidates to fill vacant positions;

4. Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under the processes to identify candidates or slates of candidates to fill vacant positions.

g. **Procedures Permitting Employees to Identify Themselves as Candidates to Fill Vacant Positions**

1. The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of the means by which employees could identify themselves as candidates to fill vacant positions, including variations, if any, considered or implemented by Rolls-Royce;

2. Directives, instructions and explanations of the interpretation, implementation and enforcement of the processes by which employees could identify themselves as candidates to fill vacant positions, including, but not limited to, the policies, practices and procedures intended to govern these processes, and variations, if any, at Rolls-Royce;

3. The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering the processes by which employees could identify themselves as candidates to fill vacant positions;

4. Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under the processes by which employees could identify themselves as candidates to fill vacant positions;

h. **Processes By Which Persons Are Selected to be Interviewed to Fill Vacant Positions, Are Interviewed, and Selected (whether recommended or final) to Fill Vacant Positions**

1. The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of the processes by which persons are selected to be interviewed to fill vacant positions, are interviewed and selected (whether recommended or final) from among interviewed persons to fill vacant positions and the review and approval of persons selected to fill vacant positions, including variations, if any, considered or implemented by Rolls-Royce;

2. Directives, instructions and explanations of the interpretation, implementation and enforcement of the processes by which persons are selected to be interviewed to fill vacant positions, are interviewed and selected (whether recommended or final) from among interviewed persons to fill vacant positions and the review and

approval of persons selected to fill vacant positions, including, but not limited to, the policies, practices and procedures intended to govern these processes, and variations, if any, at Rolls-Royce;

3. The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering the processes by which persons are selected to be interviewed to fill vacant positions, are interviewed and selected (whether recommended or final) from among interviewed persons to fill vacant positions and the review and approval of persons selected to fill vacant positions;

4. Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under the processes by which persons are selected to be interviewed to fill vacant positions, are interviewed and selected (whether recommended or final) from among interviewed persons to fill vacant positions and the review and approval of persons selected to fill vacant positions;

i. **Non-Competitive Promotions**

1. The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of the processes by which employees receive non-competitive promotions, including variations, if any, considered or implemented by Rolls-Royce;

2. Directives, instructions and explanations of the interpretation, implementation and enforcement of the processes by which employees receive non-competitive promotions, including, but not limited to, the policies, practices and procedures intended to govern these processes, and variations, if any, at Rolls-Royce;

3. The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering the processes by which employees receive noncompetitive promotions;

4. Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under the processes by which employees receive non-competitive promotions;

8

j.    **Other Promotion Process**

1.    The research, design, creation, alteration and amendment (including any consideration of changes that were not implemented) of any other promotion process, including variations, if any, considered or implemented by Rolls-Royce;

2.    Directives, instructions and explanations of the interpretation, implementation and enforcement of any other promotion process, including, but not limited to, the policies, practices and procedures intended to govern these processes, and variations, if any, at Rolls-Royce;

3.    The respective roles and responsibilities of business or administrative units throughout Rolls-Royce, both vertically through the chain of management and horizontally through the Human Resource organization and other staff and shared services, for administering any other promotion process;

4.    Any evaluations of the impact on employees by gender including, but not limited to, evaluating the relative or comparative treatment of how male and female employees fare under any other promotion process;

k.    Rolls-Royce's efforts to preserve and maintain documents relevant to this litigation from 2005 to the present;

l.    Rolls-Royce's destruction or purging policies for documents or records from 2002 to the present;

m.    The layout and configuration of Rolls-Royce's computer systems and electronic data sets, including but not limited to (a) the manner in which electronic mail is stored and retrieved; (b) the processes for archiving documents and electronic mail; (c) the processes for backing up and restoring data; (d) the processes for online storage and/or direct access storage devices attached to Rolls-Royce's mainframe computers and/or minicomputers; (e) the processes relating to off-line storage, backups and archives, floppy diskettes, tapes and other removable electronic media; (f) the procedures for replacing electronic data storage devices and/or media; (g) the processes for preserving data on fixed drives attached to stand-alone microcomputers and/or network workstations; (h) the processes for maintaining an activity log to document modifications made to any electronic data processing system.

n.    Rolls-Royce's retention policy for documents or records, including electronic documents or records.

o.    Rolls-Royce's efforts to produce and preserve documents or records, including electronic documents or records, in response to Plaintiff's First Set of Interrogatories and Plaintiffs First Request for Production of Documents.

p.     Rolls-Royce's backup and archive procedures for electronic documents or records.

q.     Rolls-Royce's e-mail policies, procedures and processes.

r.     Rolls-Royce's search for documents and information for its responses to the discovery requests served on it in this action, including any searches of laptops or other company computers.

s.     The individuals contacted to provide responses to the discovery requests served on it in this action.

t.     Rolls-Royce's written responses and the documents provided in response to the discovery requests served on it in this action.

[Id.].

In addition to producing one or more corporate representatives to discuss the above described topics and subtopics, Plaintiffs also demanded that Defendants produce documents regarding each of these issues.   [Id.].  On top of this, Plaintiffs also demanded that Defendants produce the following seven individuals for deposition: Mike McKibben ("McKibben"), Bill Bittner ("Bittner"), Paul Carter ("Carter"), Phil Cagel ("Cagel"), Scott Crislip ("Crislip"), Norm Egbert ("Egbert") and Jim Guyette ("Guyette").[3]  [2/12/08 Letter, Exhibit B].

On February 19, 2008, the undersigned advised Plaintiffs' counsel that Carter had retired and resides in the United Kingdom and that Cagel would be traveling to the United Kingdom during the remainder of the discovery period and would not be available for deposition.  [2/19/08 E-Mail, Exhibit C].  The undersigned also advised Plaintiffs' counsel that they have been unable to speak with McKibben, Crislip or Egbert regarding their availability for deposition and that they also have been unable to speak with Bitner -- who has retired from the company.   [Id.].  Additionally, the undersigned also stated that Defendants would not agree to produce Guyette --

---

[3] Plaintiffs have been aware of each of these witnesses since the inception of this matter.  In fact, Plaintiffs identified these witnesses on their own Preliminary Witness and Exhibit List, which was filed on January 16, 2007.  [Doc. #30].

who is located in Chantilly, Virginia -- for deposition because he is the President and CEO of

Rolls-Royce North America and lacks personal knowledge of Plaintiffs' claims.[4]   [*Id*.].

### III. Discussion

A.   **The Court Should Quash Plaintiffs' Rule 30(b)(6) Deposition Notice And Enter A Protective Order Precluding The Depositions Of Defendants' Current And Former Employees.**

Federal Rule of Civil Procedure 26(b)(2)(C) provides that the Court shall limit discovery

in certain situations, including when the discovery is "unreasonably cumulative or duplicative,"

when the party seeking discovery "has had ample opportunity by discovery in the action to

obtain the information sought;" or when "the burden or expense of the proposed discovery

outweighs its likely benefit."   Fed.R.Civ.P. 26(b)(2).   In such cases, Rule 26(c) provides that the

Court may make "any order which justice requires to protect a party" including that the

discovery "not be had."   Fed.R.Civ.P. 26(c).

It is well established that the Court has broad discretion to determine when a protective

order is appropriate to limit discovery and the degree of protection that is required.   *See Seattle

Times Co. v. Rhinehart,* 467 U.S. 20, 36 (1984); *Patterson v. Avery Dennison Corp.,* 281 F.3d

676, 681 (7th Cir. 2002).   In deciding whether good cause for a protective order exists, the district

court must balance the interests of the parties, the harm to the party seeking the protective order,

and the importance of the disclosure to the non-moving party.   *Id.*

Here, the Court should grant a protective order to quash the Rule 30(b)(6) deposition

notice and preclude the depositions of the individual witnesses because Plaintiffs failed to

provide reasonable notice of the depositions; Plaintiffs have had ample opportunity to conduct

the depositions during discovery in this matter and they provide no reasonable explanation for

---

[4] It is well settled that where a high ranking corporate official lacks superior or unique personal knowledge of the issues in a case, less burdensome discovery procedures should be pursued *prior to* taking the official's deposition. *See Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681 (7th Cir. 2002).

scheduling these depositions at the last-minute; and forcing Defendants to produce the deponents

on the expedited basis requested by Plaintiffs will place an unfair, unreasonable and unjustifiable

burden on Defendants.

**1.      Plaintiffs Failed To Provide Reasonable Notice Of The Depositions.**

Federal Rule of Civil Procedure 30(b)(1) requires a party to provide "reasonable notice"

for a deposition.  The determination of whether a deposition notice is "reasonable," depends

upon the facts of the  particular case, including the complexity of the case, the timing of the

deposition in conjunction with the discovery period, and the schedules of the witnesses and

attorneys. *See, e.g., Ross v. Black & Decker, Inc.,* 977 F.2d 1178, 1186 (7th Cir. 1992)(affirming

the district court's decision to quash a discovery deposition where the attorney created the

problem through lack of diligence, the witness was well known, and the failure to obtain the

deposition in a timely manner should not be rewarded); *Koplove v. Ford Motor Co.,* 795 F.2d 15,

18 (3rd Cir. 1986)(recognizing that "scheduling orders are at the heart of case management.  If

they can be disregarded without a specific showing of good cause, their utility will be severely

impaired"; holding that a party seeking the extension must affirmatively demonstrate, with

specificity, diligent effort and unusual circumstances that have frustrated those efforts);

*Katsiavelos v. Federal Reserve Bank,* 1995 WL 398901, at *3 (N.D. Ill. 1995)(extension of

discovery deadline denied where case had been filed 18 months prior and the plaintiff had

received previous extensions); *Fisher v. National R. R. Passenger Corp.,* 152 F.R.D. 145, 158

(S.D. Ind. 1993)(noting that the Court was "without reason to alter the CMP or to allow Plaintiff

to conduct the supplemental discovery").

Common sense dictates that any requests for discovery must be made in sufficient time to

allow the opposing party to respond before the termination of discovery. *See Northern In. Public*

*Service Co. v. Colorado Westmoreland, Inc.*, 112 F.R.D. 423, 424 (N.D. Ind. 1986)("[w]hen the court sets a date for the termination of discovery, the parties should heed the logical import of such a deadline: the parties should complete discovery on or before that date and will not receive the benefit of court supervision of discovery which is to occur after that date"). This is particularly important with respect to a deposition, which places additional burdens on the parties, witnesses and lawyers in terms of preparing for, and attending the deposition. *See, e.g., United States v. Philip Morris Inc.*, 312 F.Supp.2d 27, 36-37 (D. D.C. 2004)(notice of three business days, "especially to busy litigators who need to prepare to testify about events occurring six to nine years previously," does not constitute "reasonable notice"); *Vardon Golf Co., Inc. v. Supreme Golf Sales, Inc.*, 1989 WL 153335, *1-2 (N.D. Ill. 1989)(four days notice of deposition at distant locale unreasonable).

Furthermore, Rule 30(b)(6) imposes special additional obligations upon a business entity -- such as Defendants -- in advance of a deposition: to perform a reasonable search for information and to prepare the selected deponent to adequately testify not only on matters *known by the deponent*, but also on subjects that *the entity should reasonably know.* Fed. R. Civ. P. 30(b)(6). *See also Beloit Liquidating Trust v. Century Indem. Co.*, 2003 WL 355743, at *7 (N.D. Ill. 2003); *Alexander v. F.B.I.*, 186 F.R.D. 148, 152 (D. D.C. 1999). Accordingly, a Rule 30(b)(6) deposition notice should be quashed as unreasonable where the notice is issued within a few weeks of the close of discovery in a long-pending and complex case and it is obvious, or at least probable, that the schedules of the deponents and also a number of lawyers would be unable to accommodate the belatedly filed notice. *See In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 320, 327 (N.D. Ill. 2005)(quashing notice under these circumstances).

In this case, after twenty-months of litigation and within two weeks of the close of discovery, Plaintiffs served a Rule 30(b)(6) deposition notice that canvasses dozens of various topics and subtopics and also requested that Defendants produce seven additional current and former employees for deposition.  Given the wide ranging nature of the topics and subtopics identified in the Rule 30(b)(6) Notice, it is almost certain that Defendants will have to produce numerous corporate representatives to knowledgeably testify about them.  In any event, there can be no credible dispute that locating, preparing and producing even one witness who is available to respond to all of these issues -- not to mention accommodating the schedules of Defendants' lawyers at the last minute to address these issues -- will take a substantial amount of time and more than the remaining two weeks remaining in the discovery period.

Additionally, in order to properly respond to the topics and subtopics identified in the Rule 30(b)(6) Notice -- which essentially cover all of the issues in this case -- Defendants unreasonably may have to produce all of the witnesses identified in this matter.  *See, e.g., IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537, 541 (7th Cir. 1998) (noting that the party's decision to proceed under a 30(b)(6) deposition for vague questions that one person could not answer was a mistake; discovery would have been more appropriate by serving written discovery and deposing knowledgeable individuals on particular points); *In re Independent Service Org. Antitrust Litigation,* 168 F.R.D. 651, *14-15 (D. Kan. 1996) (granting a protective order where Rule 30(b)(6) deposition was overly broad, inefficient and unreasonable; stating that a party is not required to have counsel "marshal all of its factual proof").  Similarly, requiring Defendants to scrutinize the 20 separate topics and 40 discreet subtopics to ensure that all responsive documents on these issues have been produced is completely unreasonable in the time allotted -- particularly considering the fact that over 35,000 pages of materials have been

produced to date.  *See Canal Barge Co. v. Commonwealth Edison Co.,*  2001 WL 817853, at *5 (N.D. Ill. 2001)(quashing deposition notice that contained extensive request for document production).  Accordingly, the Court should deny Plaintiffs' eleventh-hour attempt to ambush Defendants by demanding that the produce corporate representatives to testify about dozens of various topics and subtopics and that they also produce seven additional current and former employees for deposition.

2.    **Plaintiffs' Have Had Ample Time To Schedule And Complete The Depositions Of Defendants' Witnesses.**

This case has been pending since May 2006.  Plaintiffs could have requested to take the depositions of Defendants' corporate representatives and the seven individual witnesses -- McKibben, Bittner, Carter, Cagel, Crislip, Egbert and Guyette -- at any point during discovery in this matter.  In fact, Plaintiffs identified each of the seven named witnesses *on their own Witness List* in January 2007.  [Doc. #30].  Accordingly, Plaintiffs cannot possibly claim that they were unaware of these witnesses.  However, Plaintiffs provide no explanation for why they failed to schedule or take these witnesses depositions throughout the over twenty months that this case has been pending.  Similarly, they provide no explanation for why they waited until the very last minute to even solicit dates for their depositions.  This is unreasonable and the Court should not reward Plaintiffs' dilatory conduct -- particularly after the Court's repeated admonishment of Plaintiffs to "diligently prosecute the case" and to "devote sufficient resources to the litigation to comply with the amended deadlines."  [Doc. ## 52, 63].

3.    **Forcing Defendants To Produce The Deponents In An Expedited Manner Will Unfairly And Unjustifiably Burden Defendants.**

Plaintiffs' eleventh-hour request to take these depositions not only is unreasonable but will create an unfair and unjustifiable burden on Defendants.  As set forth above, the Rule

30(b)(6) Notice canvasses virtually every conceivable issue in this case.  In order to properly prepare for such a deposition and fully comply with Plaintiffs' request, Defendants will have to examine all of the materials that have been produced to date -- over 35,000 pages of documents -- to ascertain if any documents responsive to the Rule 30(b)(6) deposition topics have not been produced and also to familiarize their corporate representatives with the materials so that they can knowledgeably testify about all of the requested topics and subtopics.

Furthermore, with respect to the seven individual witnesses, some of them are no longer are employed by Defendants and will have to be located in order to ascertain if they are even available to attend a deposition.  Additionally, one of the witnesses -- Guyette -- is located in Virginia and at least two of them -- Carter and Cagel -- are out of the country in the United Kingdom.  On top of this, Defendants' counsel has been unable to consult with the remaining deponents to ascertain their availability and -- given the abrupt nature of Plaintiffs' request -- Defendants counsel is only available on one remaining day of the discovery period.  Defendants submit that forcing them to scramble and rearrange their schedules, find witnesses, prepare for depositions and require witnesses to travel for depositions over the course of seven business days[5] -- all at the last minute to accommodate the dilatory nature of Plaintiffs' deposition requests -- is fundamentally unfair.  This is particularly true given the substantial amount of time Plaintiffs have had to schedule and take depositions in this matter.  Accordingly, the Court should quash the Rule 30(b)(6) Deposition Notice and also preclude or limit Plaintiff from taking the depositions of the identified current and former employees.  *See, e.g., In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. at 320 (quashing notice served only a few weeks before close of discovery).

---

[5] Excluding February 18, 2008, which is a Federal holiday and also a holiday recognized by Defendants.

In the event that Plaintiff tries to use the scheduling conflicts as a last-minute excuse to justify a further extension of the non-expert discovery deadlines in this case, it should not be permitted by the Court. This Court already has extended discovery by four additional months -- from October 26, 2007 to February 29, 2008. Further, during this intervening period -- and in fact throughout the previous year -- Plaintiffs never once requested to take the depositions of Defendants' corporate representatives. The Court should not reward Plaintiffs' inexcusable lack of attention to the Case Management Deadlines, especially where the individual witnesses that Plaintiffs seeks to depose -- including Defendants' corporate representatives -- have been known to Plaintiffs since the outset of this case over twenty months ago. *See, e.g., Mallas v. United States,* 1995 WL 290401, at *2 (4th Cir. 1995)(refusing to reopen discovery after the plaintiff had been given one extension of time, noting that the plaintiff had more than one year to conduct discovery in support of his claim); *Dreyer v. GACS Inc.,* 204 F.R.D. 120, 123 (N.D. Ind. 2001)(denying motion to enforce subpoena served after the discovery deadline in the scheduling order; recognizing that to allow a party to continue with formal discovery after the deadline unnecessarily lengthens the discovery process and diverts the parties' attention from the post-discovery aspects of preparing a case for trial); *Northern In. Public Service Co. v. Colorado Westmoreland, Inc.,* 112 F.R.D. 423, 424 (N.D. Ind. 1986)(granting protective order to plaintiff where defendant served written discovery requests on the day discovery was to terminate under the court's pre-trial scheduling order).

## IV.  Conclusion

For the foregoing reasons, Defendants request that the Court enter an order quashing Plaintiff's Rule 30(b)(6) Deposition Notice, preclude the depositions of current and former employees, and grant all other relief as is just and appropriate.

Respectfully submitted,


*s/Hannesson I. Murphy*
R. Anthony Prather
tony.prather@btlaw.com
Hannesson I. Murphy
hmurphy@btlaw.com
**BARNES & THORNBURG**
11 South Meridian Street
Indianapolis, Indiana  46204
Telephone:  (317) 236-1313
Facsimile:  (317) 231-7433

Attorneys for Defendants


## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February, 2008, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Kevin Betz - kbetz@kbetzlaw.com
Sandra L. Blevins - sblevins@betzadvocates.com


*s/Hannesson I. Murphy*
Hannesson I. Murphy


INDS02 HMURPHY 955840v1