UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| SALLY A. RANDALL and RONA C. PEPMEIER, Individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-860-SEB-JMS |
| | ) | |
| ROLLS-ROYCE CORPORATION, ROLLS-ROYCE NORTH AMERICA, INC., ROLLS-ROYCE NORTH AMERICA HOLDINGS, INC., and ROLLS-ROYCE NORTH AMERICA (USA) HOLDINGS CO., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER DENYING PLAINTIFFS' MOTION TO STRIKE EXPERT TESTIMONY
AND DEFENDANTS' MOTION TO STRIKE EXPERT TESTIMONY
AND DENYING CLASS CERTIFICATION**

Plaintiffs, Sally A. Randall and Rona C. Pepmeier, contend that their employer,

one or more of the four Rolls-Royce-related companies named as Defendants[1],

discriminated against them based upon their gender.  They contend that over the course of

many years, the defendants have engaged in a pattern and practice of discrimination

against women at the Indianapolis Rolls-Royce facility, who work in a wide range of

upper level management positions.  On this basis, their Title VII and Equal Pay Act

---

[1]For purposes of this order only, it is not important to differentiate among the four named
Defendants.

lawsuit has been premised, for themselves and other women similarly situated.[2]

Currently pending before the Court are Plaintiffs' Motion for Class Certification (Doc. #168) and their Motion to Strike Defendants' expert witness (Doc. #199). Also pending are Defendants' two separate summary judgment motions, each directed at the respective individual Plaintiffs' claims (Doc. #127 & #130) and Defendants' Motion to Strike Plaintiffs' Expert, which was filed as part of their response to the Plaintiffs' class certification motion (Doc. #187). Taking into account the shifting orders of proof and burdens of persuasion once a pattern and practice of discrimination is established, we shall first address the issue of class certification before considering the merits of the individual plaintiffs' claims. *See Thiessen v. General Electric Capital Corp..* 267 F.3d 1095, 1106 (10th Cir. 2001).

Typically, class claims of systemic discrimination utilize statistical evidence, presented and interpreted by expert statisticians. 1 Lex K. Larson*, Employment Discrimination* § 9.01 (2d ed. 2000). Accordingly, if there is a dispute as to the value or applicability or efficacy of either side's expert statistical analysis, the way in which that

---

[2]Plaintiffs assert a disparate impact claim in addition to a pattern and practice claim. Both claims include the assertion of systemic discrimination. However, most courts, including this one, view a pattern and practice claim to require a showing of intentional discrimination (proof of which may include evidence of disparate impact), whereas a disparate impact claim involves identifiable facially neutral policies which, when applied, lead to discriminatory results. *See Mozee v. American Commercial Marine Service Co.,* 940 F.2d 1036, 1051 (7th Cir. 1991); *see also* 1 Charles A. Sullivan & Lauren M. Walter, *Employment Discrimination Law and Practice* § 3.04(E)  (4th ed. 2009).

dispute is resolved impacts both the underlying systemic discrimination claim and the determination of whether a viable class action exists.  *E.g. Garcia v. Johanns,* 444 F.3d 625, 635 (D.C.Cir. 2006).  Thus, we begin with a discussion of the motions challenging each side's expert witnesses.

## I.   <u>Plaintiffs' Motion to Strike Defendants' Expert Witness (Doc.#199)</u>

Plaintiffs contend that Defendants' expert witness, Dr. Bernard Siskin, should not be allowed to testify because he was never identified by Defendants in their Rule 26(a)(2) disclosure.  Defendants engaged Dr. Sisken as a replacement for the expert they had previously retained and disclosed, Dr. Donald Harnett, which change, at least at this stage of the proceedings, they are permitted to do.  In any event, we perceive no prejudice to Plaintiffs by this substitution.

On February 29, 2008, Plaintiffs served their Rule 26 expert disclosure on Defendants.  That disclosure  provided only the name, address and vita of Dr. Richard Drogin.  It did not provide any of Dr. Drogin's expert opinions or statistical analysis, because, he averred, he had yet to receive sufficient data from the ongoing discovery process  to complete his analysis.  Defendants were required by the case management order to serve their expert counter-designation thirty days thereafter, pursuant to which they identified Dr. Harnett as their expert and represented that he would respond to any statistical analysis performed by Dr. Drogin.  Following some discovery disagreements,

including a ruling by the court on motions to compel, Plaintiffs, on February 13, 2009, served the expert report from Dr. Drogin.

This report was forwarded by Defendants to Dr. Harnett who began his evaluation of the analysis contained in the report but soon concluded that he needed the underlying studies and statistical programs created or used by Dr. Drogin.  In response to the Defendants' request for such materials, Plaintiffs produced four discs containing more than 1,000 separate electronic files.  In order to evaluate that amount of data and the studies conducted relative thereto by Dr. Drogin, Dr Harnett required additional computing power beyond that which he had available to him at the time.  Accordingly, Defendants retained the firm of LECG, LLC, located in Philadelphia, to serve as a consultant and to assist Dr. Harnett with processing the data.

The Labor Practice Unit of LECG, LLC, is headed by Dr. Sisken.  His expertise includes the application of statistics to employment practices.  Following an initial meeting with Dr. Sisken, Dr. Harnett traveled to Philadelphia on March 17, 2009, to collaborate on the statistical analysis to be included in Defendants' expert report which was to be served on Plaintiffs on March 27, 2009.  Counsel for Plaintiffs and Defendants were working simultaneously to arrange a deposition of Dr. Harnett, having previously completed the deposition of Dr. Drogin.  A date of April 18, 2009, was agreed upon for the deposition of Defendants' expert.

While at LECG, on March 19, 2009, Dr. Harnett informed Dr. Siskin and counsel for Defendants that his step-daughter was suffering from  Stage IV cancer (melanoma), which had metastasized to her lymph nodes, brain and liver, and that her prognosis was poor.  He also explained that his step-daughter lived in Columbus, Ohio, and that he made regular trips back and forth from his home in North Carolina to Columbus, Ohio, to help care for his grandchildren during periods when  his step-daughter underwent chemotherapy and brain radiation.  Dr. Harnett informed the others that due to the need to make another trip, he would be unavailable to them prior to his deposition.

Given the seriousness of the medical crisis affecting Dr. Harnett and his family, Defendants concluded that it would be inappropriate to push Dr. Harnett to complete the report and to attend his deposition.  Defendants' decision reflected both their sympathy for Dr. Harnett's situation and their concern that he might be preoccupied during this critical phase of the litigation.  Thus, they retained Dr. Sisken to serve as a testifying expert, rather than a consultant, and  Dr. Harnett was excused from further participation in the case.  Counsel for Defendants communicated this decision to counsel for Plaintiffs on March 20, 2009, promising to produce the expert report in a timely fashion and to honor the previously agreed upon deposition date.  While not agreeing to the substitution, Plaintiffs did agree to proceed with the deposition, but reserved the right to object, which they eventually did on May 20, 2009, in filing their Motion to Strike Dr. Sisken.

Plaintiffs maintain that Dr. Harnett was far less qualified than Dr. Drogin or Dr.

-5-

Sisken.  They speculate that the switch in experts was not actually dictated by the health

crisis in Dr. Harnett's family, but rather was a tactical decision made by a new member of

Defendants' legal team after determining that Dr. Harnett could not perform as

proficiently as an expert witness as the more experienced Dr. Sisken would do.

According to Plaintiffs, Defendants should have sought leave to substitute an expert,

rather than simply substituted Dr. Sisken *sua sponte*.

        We agree that a motion to substitute one expert for another would have been the

better practice, especially in light of Plaintiff's objection at the time.  However, Plaintiffs'

objection was not brought to the court's attention in a timely fashion.  Plaintiffs instead

moved forward with the development of their case by deposing Dr. Sisken, after which

they waited another month to file their motion to strike.  More important, there is no

prejudice to Plaintiffs resulting from the substitution.  When the substitution occurred, no

expert report had been created or produced.  In addition, it is highly unlikely that we

would have denied the request to substitute experts, had Defendants requested that, in

light of Dr. Harnett's family crisis.  Plaintiffs' assertion that they have been prejudiced by

the substitution based on their having developed their litigation strategy around the

alleged lack of experience of Dr. Harnett is unconvincing; even if Plaintiffs had engaged

in tactical decision-making based upon the identity of the person they thought would be

offering opposing expert testimony, there was no prejudice since their own expert

apparently had a sufficient opportunity to allow him to submit a fairly lengthy

supplementation (rebuttal) to his expert report.  Because we would not have required Defendants to continue to use Dr. Harnett, given his family circumstances, even if they had requested a substitution back in March or April of 2009, we will not punish them now for having made that substitution *sua sponte*.

In the alternative, Plaintiffs request that we limit Dr. Sisken's testimony to that which could reasonably have been proffered by Dr. Harnett.  It is unclear exactly how Plaintiffs expect to divine the essence of Dr. Harnett's proffered testimony, given that he has not  completed his analysis or prepared his written report.  In any event, we refuse to engage in what might well be nothing more than a purely speculative exercise, especially in the absence of any prejudice to Plaintiffs from the substitution.  Therefore, we deny Plaintiffs' Motion to Strike in its entirety.

## II.    <u>Defendants' Consolidated Motion to Strike Plaintiffs' Expert</u>

Plaintiffs seek to certify a class of all women who have been employed by Rolls-Royce at pay levels 71 through 75 for any time on or after October 9, 2004, who work in or are assigned to the Indianapolis facility.  In support of their motion for certification of a class action, plaintiffs rely upon the expert report of Dr. Drogin.  Dr. Drogin has opined that women at Rolls-Royce have had lower annual salaries than men within each of the salary grades since 2003 and the effects of those comparably lower salaries continue even after promotion.  In response, Defendants criticize the methodology employed by Dr.

Drogin and moved to strike both his testimony and his report under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  According to Defendants, Dr. Drogin's opinions are unreliable for a number of reasons but primarily because he ignores the impact of key compensation variables and the interaction among compensation variables.

The admissibility of expert testimony is determined with reference to the analytical framework set out in Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert*.  Applying this framework, we are required to undertake a  three-step analysis:

1. the witness must be qualified as an expert by knowledge, skill, experience, training, or education;
2. the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and,
3. the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.

Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007) (quoting Fed.R.Evid. 702); see also Kumhoe Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (extending the Daubert admissibility framework to expert testimony in the social sciences).  Here, Defendants do not challenge Dr. Drogin's expert credentials as a statistician, but they do contest both the scientific reliability of  his statistical analysis and its usefulness in deciding whether class certification is appropriate.

To fully and clearly understand the arguments raised by both sides regarding a proper statistical analysis of the compensation received by proposed class members, we must examine the ways in which jobs are categorized and compensation levels decided at

the Rolls-Royce facility.  According to its Compensation Guidebook, Rolls-Royce

attempts to ensure that its employees receive a market-competitive salary.  To accomplish

that goal, they have salary ranges based on three factors: (1) job level; (2) control point;

and (3) geographic differential.  Plaintiffs' class certification motion places at issue job

levels numbered 71, 72, 73, 74 and 75.  For purposes of establishing salary ranges, Rolls-

Royce subdivides each of those job levels into four control points designated by the

addition of a letter, which we refer to here as "salary grades."  Thus, employees in job

level 71 may be in one of four salary grades:  71A, 71B, 71C, and 71D.  Because each

level is comprised of four salary grades, and there are five job levels, a total of twenty

separate salary grades (5 x 4) fall within the proposed class.  With the possible exception

of  an occasional Indianapolis Rolls-Royce employee who is temporarily stationed

elsewhere within the organization, the geographic differential factor is the same for all

Indianapolis employees.

The range for salaries across these various levels in the proposed class is quite

broad.  For example, in 2005, an employee holding a grade 71A position might have an

annual base salary as low as $40,050, while a grade 75D could have an annual base salary

of $190,750.  The salary grades in the proposed class also encompass a wide range of

individual employee contributors, as well as managers and directors.[3]  Employees at level

_____

[3]Plaintiffs initially sought to include all exempt salary levels in the class, which would
have included salary levels 70, 76 & 77 as well, but have since eliminated those levels from the
(continued...)

71 are individual contributors who do not manage others.  However, employees working at job levels 72-75 are classified either as individual contributors (i.e., employees who report to a manager) or as managers supervising other employees.  Both name plaintiffs, Randall and Pepmeier, for example, worked within levels 74 and 75 during the applicable time period and each supervised others within the proposed class.  This responsibility would have required them to participate in the compensation decisions of others in the putative class who worked under them.  (We discuss this issue more fully later in this ruling.)

Rolls-Royce sets the salary ranges for each grade, including the twenty at issue here, after conducting annual reviews of outside surveys which inform their market pricing decisions for the types of jobs falling within each salary grade.  Salary ranges within job levels as well as within the respective control points vary significantly. Additionally, significant overlaps exist between and among the ranges for different job levels and control points (i.e., an employee working as a 71A could be paid more than an employee who works as a 73A).  Thus, a specific employee's salary within all these ranges depends on a variety of factors, including the complexity of the respective employee's job, the employee's particular experience level and qualifications, and the employee's individual performance.

---

[3](...continued)
proposed class after receiving and analyzing the salary data.

An employee's position within the salary range is referred to by Rolls-Royce as that employee's "compa-ratio." The compa-ratio reflects the employee's actual salary divided by the midpoint of the salary range for his job's salary grade. For example, if an employee working as a 71A is paid $50,000, and the midpoint of the range is $53,400, the employee's respective compa-ratio would be 93.6 per cent.

Rolls-Royce conducts annual reviews of every individual employee's performance, in part to determine whether the employee's performance merits a raise. As part of the evaluation process, employees are assigned a Performance Development Review ("PDR") score by their manager. This score governs the amount of a merit increase the employee will receive. In addition to this annual review process, managers at Rolls-Royce have discretion to award various types of adjustments to an employee's base salary, such as an "equity adjustment" to modify salary to make it commensurate with the market and reflective of the scope of the employee's job duties. Managers can also make a critical skills adjustment ("CSA") for top performing employees who have skills critical to the business and are top performers. Dr. Drogin's report omits any consideration of these additional discretionary compensation tools in terms of gender; rather, it addresses only the base salary differentials comparing the two genders.

In challenging Dr. Drogin's statistical analysis and its relevance to class certification issues, Defendants rely on the report of their own statistical expert, Dr. Bernard Sisken, who examined Dr. Drogin's analysis (both that which was made a part of

Drogin's report and the additional analysis completed by Drogin but not included in his report) and conducted his own analysis. Dr. Sisken concludes that Dr. Drogin has selectively chosen to rely on only that part of his analysis which favors Plaintiffs' litigation position and ignores key data and regression analysis which, if properly taken into account, would show that a woman's gender does not adversely effect her compensation at Rolls-Royce. Defendants also cite Dr. Sisken's analysis to demonstrate that Dr. Drogin's report does not assist Plaintiffs in establishing the commonality of class claims.

Dr. Drogin has reached his conclusions regarding the common gender effect on annual salaries within the defined class based on a regression analysis, which takes into account certain individual neutral factors (independent variables) such as seniority, time-in-grade, performance ratings, personnel area and education level. Defendants take issue with the way in which Dr. Drogin defines certain of those independent variables. Nevertheless, based on the neutral factors as he defines them, Dr. Drogin concludes that the salaries of men are typically somewhere between 4.27% to 5.84% higher during the time period of 2004 through 2007 throughout the various salary grades.

In addition to challenging the manner in which Dr. Drogin defines some independent factors, Defendants also take issue with Dr. Drogin's failure to include other neutral factors. Defendants contend that there are additional factors which are clearly significant and must be included in comparing salaries, such as the particular jobs held

within a pay grade or an employee's experience in a particular job.  They also contend that the interactions between and among these variables are crucial and must be incorporated into any statistical analysis which attempts to explain the reasons for particular salary differences.

Defendants' motion to strike seeks to bar Dr. Drogin's opinion testimony and his report from any consideration whatsoever, a remedy which is much too Draconian a result, at least at this stage of the litigation.  When a court examines expert testimony offered in support of the class certification factors, it is essentially conducting a bench trial and serving as trier of fact.  *In re Fedex Ground Package Sys., Inc., Employment Practices Litigation.*, 2007 WL 3027405, at *4 (N.D. Ind. Oct. 15, 2007).  Consequently, the concern raised by the Supreme Court in *Daubert*, that juries may be bamboozled by scientific evidence of questionable merit, is of less concern in this context, where the Court is acting as fact-finder.  Thus, it becomes more pragmatic for the court to admit evidence that traces the border of admissibility and assign to it whatever weight it might be entitled to.  *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004)(noting that "gatekeeper" function becomes largely irrelevant when a court serves as the fact-finder);  *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.2000) ( "Most of the safeguards provided for in *Daubert* are not as essential in a case such as this, where a district judge sits as the trier of fact in place of a jury.");  *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1122-23 (N.D.Ill. 2005)(finding it to be a better

choice to admit borderline expert evidence when court is fact-finder).

In this case, each side accuses the other's expert of data manipulation to some degree. Defendants accuse Dr. Drogin of picking and choosing which variables to include in his regression studies so as to increase the degree of salary prediction attributed to gender; whereas Plaintiffs criticize Dr. Sisken for having attempted to account for so many variables that the statistical significance of any gender distinction is inappropriately diluted. These criticisms in our view go more to determining the weight of the evidence than to discrediting the scientific methodology employed. *See Bazemore v. Friday,* 478 U.S. 385, 400 (1986). While we may ultimately be more convinced by the studies of one expert compared to the other, we find no basis to conclude at this juncture that either has engaged in the promotion of "phony science" or mystical statistical analysis. Clearly, each has pursued his own distinct approach to arrive at his expert opinion, but each should be allowed to provide his opinion for the record so that any factual or legal determinations can be based on a finding as to which is the more persuasive. Accordingly, Defendants' Consolidated Motion to Strike Plaintiffs' Expert is <u>denied</u>.

### III.  <u>Motion For Class Certification</u>

Plaintiffs seek class certification pursuant to Fed.R.Civ.P. 23(b)(2); however, because awards of back pay are being sought, in addition to injunctive relief, Plaintiffs

contend that each potential class member needs to be notified of the lawsuit and given an opportunity to opt out, as though the class action were being brought pursuant to Rule 23(b)(3).  *See Allen v. International Truck and Engine Corp.,* 358 F.3d 469 (7th Cir. 2004).

To prevail on their motion for class certification, plaintiffs must propose a class definition which results in an identifiable class.  *Oshana v. Coca-Cola Co.,* 472 F.3d 506. 513 (7th Cir. 2006).  There appears to be no disagreement over the fact that the proposed class in this case is adequately identifiable.  Plaintiffs thus must next satisfy all of the threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality and adequate representation.  If successful in that regard, Plaintiffs must overcome the final hurdle by showing that the circumstances of their case fit one of the three "types" of class actions which Rule 23(b) defines.  Unlike a motion to dismiss, we are not obligated to presume the truth of any of Plaintiffs' factual assertions in reaching a decision on class certification.  *Szabo v. Bridegeport Machines, Inc.,* 249 f.3d 672, 675-76 (7th Cir. 2001).

A.    **Numerosity**

Plaintiffs maintain that their proposed class includes at least 537 women, making it extremely difficult and inefficient to effectuate joinder.  Defendants attack this contention

only on the assumption that these 537 women comprise a homogeneous group, asserting that the differences in jobs, experience and other variables negate such a characterization. Defendants' challenge therefore attacks the required elements of commonality and typicality in that it addresses the issue of whether the class members are in fact similarly situated. Defendants do not complain that Plaintiffs have miscalculated the number of female employees who held jobs in pay grades 71 through 75 during the relevant time period. Accordingly, we find that Plaintiffs have demonstrated that the number of putative plaintiffs in the class, as they have defined it, is too large to make joinder practicable. *See* Fed.R.Civ.P. 23(a)(1).

### B. Commonality

The existence of a common nucleus of operative fact is generally sufficient to satisfy the commonality requirement of Rule 23(a)(2). *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). "Common nuclei of fact are typically manifest where ... the defendants have engaged in standardized conduct towards members of the proposed class." *Id.* Broad groups of employees whose roles in the company might otherwise be too distinct for employment based class consideration, such as we have here, can still be considered appropriate for a single class, if they are all subject to an overriding discriminatory policy. *See Palmer v. Combined Ins. Co. of America*, 217 F.R.D. 430. 436 (N.D.Ill. 2003). Plaintiffs in this case maintain that the commonality requirement is met because Rolls-Royce has instituted a company-wide policy of "premising compensation

-16-

on prior base salaries carried forward from the past," thereby giving rise to a common nucleus of fact.

The commonality requirement of Rule (23(a)(2) is, in general, a relatively low hurdle for plaintiffs.  Nevertheless, we question whether the so-called company-wide policy or standardized conduct as alleged by Plaintiffs is in any way meaningful.  Stating that Rolls-Royce had a policy of annually adjusting an employee's base salary by carrying forward his or her previous year's base salary is a bit like saying the company calculates its annual increase or decrease in profits by referring back to what it made the year before.  We suppose that one could attempt to categorize this as a policy, rather than a common sense practice, but it borders on being a "given" and thus has limited, if any, meaning or value in determining if a group of employees is bound together by a common nucleus of relevant facts.

We have additional difficulties with the manner in which Plaintiffs have described this so-called company-wide policy.  Plaintiffs focus only on the fact that base salaries are adjusted by awarding percentage-based increases, thus ignoring other key parts of the overall compensation scheme.  It is undisputed that supervisors may award employees merit increases and bonuses as well as utilize critical skills adjustments to effect the overall compensation of an individual employee.  Indeed, these discretionary tools along with a supervisor's discretion in determining the amount of any raise in base salary go a long way toward diminishing any proof of a centralized objective policy which results in

a common pattern and practice of discrimination.  *See e.g., Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 424 (N.D. Ill. 2003) ("[i]n order to permit such a pattern or practice, the decision-making must be sufficiently centralized and the decisions themselves must be sufficiently objective to form part of the company's standard operating procedure").  Even if salary ranges are predetermined centrally, those ranges are broad, and the fact that hundreds of supervisors have the discretion to apply adjustments, bonuses and other incentives to effect a subordinate's salary creates a circumstance that is significantly subjective and unique to the individual--hardly a compensation-setting circumstance which is readily amenable to a common class-wide analysis.

In addition to the declarations and deposition testimony of the two named Plaintiffs, sworn declarations of seven other female Rolls-Royce employees have been submitted in support of the class certification motion.  However, rather than support a common nucleus of claims, these declarations actually provide anecdotal evidence of distinct differences, as opposed to similarities, among each of the employee's circumstances.  While they all assert that they were paid less or treated worse than similarly situated males, none of them points to the so-called company-wide policy of perpetuation of discriminatory salaries through use of percentage-based increases to their previous year's salary as the reason for the discrimination they have all allegedly suffered.  Instead, each of these individual affidavits describes particularized incidents or

-18-

experiences which involve individual supervisors whom the declarants claim either held them back through unfair subjective evaluations or otherwise took discriminatory actions which effected their salaries.  Thus, these affidavits highlight the individual differences between and among class member claims, rather than establish a common nucleus of fact.

Nor do we find it easy to accept the premise which must be credited in order to find value in any of the statistical analyses provided by Plaintiffs' expert, that is, that the disparity in salaries between genders beginning at the start of the relevant time period was the result of discrimination.  Plaintiffs contend, and Dr. Drogin's analysis attempts to document, that there was a "perpetuation" of salary differentials, not necessarily that Rolls-Royce actually assigned women lower percentage increases than men over the course of the time period that defines the class.  Along with Dr. Drogin's analysis and as a part of their support for the presumption that any salary discrepancies existing at the start of the relevant time period were the result of discrimination, Plaintiffs offer a March 1998 press release from the U.S. Department of Labor.  This press release touts the results of a compliance program audit agreement entered into between the predecessor of Rolls-Royce at its Indianapolis facility and the Office of Federal Contract Compliance, wherein the agency obtained the company's agreement to pay nearly $500,000 in back-pay and salary increases to women in order to compensate them for inequities in pay.

Both the relevance and the admissibility of the press release is questionable in part because we do not know whether some, none, or all of the putative class members were

actually employed by the Defendants' predecessor at the time of the OFCCP audit, let alone what compensation-setting polices were being followed by that company at the time.  Moreover, the content of the press release does less to show the existence of discriminatory salaries at the start of the time period covered by the class definition than it does to suggest that any gender-based discrepancies may have been rectified by the nearly half million dollars in payments made by Defendants' predecessor as a result of the OFCCP compliance program.  In any event, without greater detail as to what was involved in the audit and what the resulting agreement purported to cover, we can not assign any significance or weight to the press release.

That brings us to the value of the statistical analysis proffered in support of Plaintiffs' claim.  In short, we do not find Dr. Drogin's statistical analysis convincing either with respect to commonality or typicality.  Our difficulty in accepting his statistical analysis centers on the variables he apparently ignored.  For example, as Dr. Sisken notes on page 3 of his report, Dr. Drogin examined components of the Rolls-Royce compensation system other than base salaries, such as the merit increases, annual bonuses, and critical skills adjustments to employee salaries, and found no evidence of disparities adverse to women.  Conveniently, that conclusion is not disclosed in his report. More important, Dr. Drogin makes no effort to account for the wide variety of jobs within a single pay grade at Rolls-Royce nor does he credit the various levels of experience each

employee might hold in those particular jobs.[4]  The fact that Dr. Drogin's own studies confirm that, in pay grades 74 and 75, there are no statistically significant disparities in base pay adverse to women cuts against a finding of commonality among all five of the grades included in the class definition.

We find Dr. Sisken's methodology of accounting for the differences across organizational units and pay grades (as reflected in his tables 15 and 16) to be the more convincing analysis of the available data, and such analysis supports a lack of commonality.[5]  In addition, we agree with Dr. Sisken's conclusion that Dr. Drogin's studies require correction so that they include only those female employees who were active at the start of the relevant time period.  Correcting for that mistake and allowing for the interaction among independent variables (the most important of which is the distinct jobs held within a pay grade[6]), Dr. Sisken has in our view convincingly demonstrated that

---

[4]For example, Dr. Drogin's analysis would treat similarly two people who held a grade 72B job, regardless of whether one employee was an individual contributor in Operations and was recently moved to a new position from another department and another employee was a supervisor who had worked in a department within the Rolls-Royce Helicopters area for twelve years.  Simple logic suggests that there would likely be a difference in the amounts those employees were paid.

[5]In addition to Dr Drogin's failure to consider independent variables which were clearly relevant to the compensation setting process described by the company in its guidelines, he invented his own method of establishing employees' prior compa-ratios in his analysis of salary discrepancy perpetuation following promotion events rather than comparing actual compa-ratios. He also has ignored the fact that women were often favored in terms of speed of promotion.

[6]In their reply brief, Plaintiffs attempt to explain away the failure of their expert to distinguish salary differential by job held as a reluctance to include a "tainted variable."   They cite the supplemental declaration of Dr. Drogin, which states that: "By including job as an

(continued...)

-21-

there is no common gender effect across the putative class.  (See Sisken Report pp. 31-38).

Assuming, *arguendo*, that we have somehow failed to credit Dr. Drogin's analysis sufficiently with regard to commonality and that there is sufficient meaning in a company-wide policy of basing adjustments to annual salaries on the previous year's salary for Plaintiffs to have made it safely passed the relatively low hurdle of demonstrating a common nucleus of fact, we are convinced that common issues nonetheless do not predominate, which we will discuss further after addressing the remaining prerequisites of Rule 23(a).

## C.     Typicality

The typicality requirement goes to the claims of the named Plaintiffs when compared to those of the class.  The Seventh Circuit has summarized the typicality analysis as follows:

> A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory.  Even though some factual variations

---

[6](...continued)
independent variable, Dr. Sisken is arguably including a tainted variable.  A reason for omitting a plausible variable is that it may be tainted."  He admits that it is a plausible variable but suggests it may be tainted because a man employee was more likely to occupy a job at Rolls-Royce that had a higher average salary than a woman employee.  However, this factor would seem to be as much a product of the raw numbers of men to women employees in the aggregate (more than six to one) than anything else, and Dr. Drogin offered no helpful statistical comparison in support of his theory.

> may not defeat typicality, the requirement is meant to ensure that the named
> representative's claims have the same essential characteristics as the claims
> of the class at large.

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir.2006)(citations omitted).

Plaintiffs Randall and Pepmeier are not themselves typical of the vast majority of putative plaintiffs, in part because of the level of the jobs they held.  Both of those named Plaintiffs held jobs in pay levels 74 or 75 throughout the entire class period.  These levels had significantly fewer numbers of women than the other three levels and, based on the analysis run by Dr. Drogin but omitted from his report, the gender effects for the jobs within those two pay levels were not consistent with those of the other levels.  Even in the analysis which Dr. Drogin submitted as part of his written report, women were favored in four out of the seven pay grades within those two levels.  (See Drogin Rpt. table 2).

Dr. Drogin's primary report does not specifically address the typicality issue, though, inexplicably, his definition of "similarly situateds" includes persons who were in the same grade as the named Plaintiffs at <u>any</u> time, rather than at the <u>same</u> time.  Dr. Sisken has compared the named Plaintiffs to male employees who were in the same grade and personnel unit at the same time they they were, as of March 1, 2004, which is near the start of the class period, and also at March 1, 2007, which was the last time reference utilized by Dr. Drogin.  From this analysis, Dr. Siskin concludes that there were no males who were similarly situated to Randall in 2004, a conclusion that is not difficult to accept in light of the limited number of employees in that grade.  In 2007, there was one male

who was similarly situated to Randall;  however, he earned a mere $55 per year more in base salary than Randall, despite the fact that he had been in grade longer than Randall and had a longer tenure with the company than Randall.

Dr. Sisken's analysis with respect to Pepmeier reveals that she had five male comparators in 2004 and was paid more than two, but less than three of them.  Each of the three employees who were paid more than Pepmeier had significantly longer tenure with the company.  Yet, by 2007, Pepmeier was paid more than nine of her ten male counterparts and nearly $30,000 more than a comparable male employee who had been with the company four years longer than she had.  According to Dr. Drogin's computation of salary expectations, Pepmeier's salary in 2006 and 2007, while in grade 74C, was more than $20,000 above the level she should have expected to earn if she had been a man. More than 86% of the proposed class members held positions in levels 71, 72 and 73 during the class period, while Pepmeier and Randall were part of the highest levels of the Indianapolis facility management team.  These statistical inconsistences not only demonstrate a lack of typicality, they tend to reinforce the difficulty Plaintiffs have experienced in establishing commonality as well.

Stepping back from a purely statistical analysis, an examination of the types of jobs held by Randall and Pepmeier and their individual claims further underscores the difficulty Plaintiffs face in demonstrating typicality.  Prior to the proposed class period, Randall held various jobs in engineering at Rolls-Royce, having worked her way up to

-24-

performing certain Chief Project Engineer assignments.  During the time she held these engineering positions, according to her deposition testimony, she believes she was discriminated against with regard to her salary.  Because the amount of her salary during the time she spent in engineering was the product of discrimination, Randall maintains that, after she moved on to Quality Assurance in 2003 and held Director level positions, her annual salary lagged behind the men in engineering who had received higher salaries and had been advanced to similar level positions to hers in Quality Assurance and, thereafter, in the Controls business unit.  Randall makes no claim that men similarly situated to her were given higher salaries in Quality Assurance, in part because of the uniqueness of her position there, thus providing further evidence of possible departmental distinctions that have not been adequately accounted for.  The claims which Randall asserts as having arisen during the class period center on her having not received certain positions for which she had applied:  Chief Engineer in the Helicopters group in September 2004; Vice President of Quality in 2005; Chief Engineer in the Joint Strike Fighter Program in 2005; and Chief Engineer for Defense Engines/EMO in 2005.  Failure

 to promote, however, is not an issue Plaintiffs have sought to pursue on a class-wide level.

     It is certainly fair to assume that the variables that go into assessing an individual

employee's performance, value and other relevant factors relied upon by Rolls-Royce in establishing an employee's annual salary increase in complexity and nuance with each increase in job level within the management progression.  As each of the class members made her way up the management ladder and was assigned a higher pay grade level, her history of experience, successes and failures grew increasingly idiosyncratic, that is to day, unique to her.  Any commonality that might have existed at the beginning of the process eventually diminished, if not disappeared altogether.  These are not non-exempt hourly jobs, remember.   The  factors which are legitimately considered during the decision making process with regard to a Director's salary (or others in the 74 or 75 level positions) are necessarily complex and unique to the position and also more complicated than was the process utilized in setting the salaries for the vast majority of the putative class who were at the lower exempt employee pay levels.

Randall's deposition testimony makes clear that her complaint with Defendants is focused on her failures to be promoted.  In fact, she apparently does not even know whether she made or continues to make less salary than men to whom she should fairly be compared after leaving her role in engineering.

Like Randal, Pepmeier also currently holds an upper level position at Rolls-Royce and has occupied jobs at  the 74 or  75 level during the entirety of the proposed class period.  Also, like Randal, Pepmeier is pursuing a claim of disparate treatment based upon her failure in the fall of 2005 to receive a particular promotion, namely, Director of

-26-

Business Improvement.  She contends that Rolls-Royce denied her the position in retaliation for her complaint regarding the harsh criticism leveled at her by the Chief Operating Officer relating to her production shortcomings earlier that year.  She believes that other Directors within Operations were not yelled at by the COO in the manner she claims she was.  Pepmeier also claims additional adverse treatment, such as her initial placement in a lower pay grade than similarly situated men after an organizational restructuring (which placement was later adjusted without any loss of pay), and her removal from full participation in executive bonus and stock sharing programs after her acceptance of a position in a lower grade.  Pepmeier believes that she has been paid less than men throughout her career in upper management, but the similarity of her claims to those of other putative class members ends there. Her claims of retaliation and failure to promote, which clearly arose out of a restructuring of Operations and a dispute as to the cause of a critical production shortcoming, are not shared with any other members of the class.

In the end, we find Dr. Sisken's statistical analysis regarding typicality issues substantially more convincing than the less substantially complete analysis of Dr. Drogin in his supplemental report.  In any event, it is plainly true that the particular circumstances surrounding the named Plaintiffs' individual claims do not comport with the required element of typicality.  Neither Randall nor Pepmeier spent any time in a pay level less than 74 during the entirety of the class period and their focus in this litigation is

clearly on recovering damages for alleged failures to promote them and/or for retaliation against them which are claims entirely unique to them.

### D.    Adequate Representation[7]

The fourth prerequisite under Rule 23(a) requires a showing that the representative parties will fairly and adequately protect the interests of the class.  Fed.R.Civ.P. 23(a)(4).  Because the rights of absent class members may be preclusively affected by the action at bar, adequacy of representation is an important linchpin in securing class certification.  **In conducting an assessment of the adequacy of the named Plaintiffs to represent an entire class, we examine their capabilities, diligence and potential conflicts, as well as those of their legal counsel.**  *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir. 1986).   Defendants address only the alleged shortcomings of the named Plaintiffs and have not challenged the capabilities of class counsel; however,

---

[7]In their brief, Defendants separately argue that the named Plaintiffs lack standing to pursue claims on behalf of the class.  The premise of the argument is that Randall and Pepmeier's claims are time-barred and thus their claims would not encompass those of the putative class members.  Regardless of whether such an argument should have been included in the analysis of the adequacy of representation, it is a non-starter.  Simply stated, the *Lilly Ledbetter Fair Pay Act of 2009*, Public Law No. 111-2, §3(A), 123 Stat. 5-6, is a game-changer with regard to timing because it retroactively amended Title VII, eliminating any statute of limitations bar against an employee's claim that a paycheck received today is lower than it should be because of a past discriminatory action. *See* 42 U.S.C. § 2000e-5(e)(3)(A).  Because Plaintiffs allege that each check was predicated on an earlier discriminatory action this claim now amounts to a separate unlawful employment action, and the Act essentially guarantees that a claimant can try to recover underpayments going back two years from the date a charge is filed. 42 U.S.C. § 2000e-5(e)(3)(B).  Both Randall and Pepmeier make claims that would fall into that category of retroactive relief provided by the Act.

even in cases where the named parties stipulate that a class action would be appropriate, appellate courts require district courts to explore the adequacy of representation to assure that the rights of absentee litigants will not being compromised. *See, e.g., Smith v. Sprint Communications Co., L.P.*, 387 F.3d 612 (7th Cir. 2004).

The Court is concerned about apparent potential conflicts of interest between the named Plaintiffs and the class. Among the managerial duties performed by both Randall and Pepmeier was the supervision of various members of the class, including participating in the compensation decisions of which at least some of them complain. We presume that both Randall and Pepmeier would defend their judgments in these respects, which may well require them to testify against the interests of class members whom they supervised. For example, if Randall or Pepmeier recommended that a male engineer working for them receive a larger raise than a seemingly similarly-situated female because of his performance or particularized contribution, their testimony would obviously conflict with the class's attempt to demonstrate a pattern and practice of discrimination. Their testimony could also effect the class's back pay claims.

Furthermore, because of the recent withdrawal of the most experienced counsel for Plaintiffs, we lack adequate information on which to assure ourselves that local counsel, in combination with new counsel from Washington, D.C., who has only recently appeared, are capable of adequately prosecuting the claims of several hundred putative class members. Kevin Betz and Sandra Blevins of Betz & Associates are the Plaintiffs'

-29-

local attorneys.  Mr. Betz has considerable experience in Title VII and employment law litigation, including trial experience, and Ms. Blevins has assisted him in most recent cases, but together they have very little class action experience, none of which involves prosecution of Title VII class claims.  Further, until they secured the assistance of additional, more experienced counsel, this case progressed at an almost imperceptible pace, with Plaintiffs seeking and receiving numerous extensions of the deadlines for filing their class certification motion, to the point that the Court finally had to admonish counsel regarding their duty of diligence and to voice our concerns over the apparent limited resources being devoted to the case.  (*See* Court's Orders at  Doc. #52, Doc. #63 & Doc. #83).  The addition of Steven Sprenger and his associates from the Washington, D.C. firm, Sprenger & Lang, along with Thomas Henderson, who has an "of counsel" relationship with that firm, provided Plaintiffs with apparently much needed class action expertise and additional resources; however, Sprenger and his firm have recently withdrawn from the case, citing irreconcilable differences between co-counsel.[8]

New appearances on behalf of Plaintiffs have been filed by attorneys from the firm Sanford, Wittels & Heisler, LLP, in Washington, D.C., but the Court has not been provided any information regarding the level of class action experience of these attorneys or the resources available from their firm that can be devoted to this case.  Without such

---

[8]Thomas Henderson has not withdrawn his appearance, but it is unclear whether he is still working on the case in light of his relationship with the Sprenger & Lang Firm.

information, we cannot conclude with confidence that the class would be adequately represented.

Because the burden of establishing each prerequisite under Rule 23(a) is on the plaintiffs, the failure to meet any of the four requirements is grounds for denial of the motion. *Retired Chicago Police Ass'n. v. City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993). As discussed above, Plaintiffs have failed to carry their burden on three of the four prerequisites. We are convinced that this is a case where Plaintiffs and the proposed class members undoubtedly share a common belief that as women employees they have been treated less favorably then men employed at Rolls-Royce, but the inescapable fact is that they share little else in common because of the diverse nature of their jobs, experience and supervision. Claiming that the case is suitable for class treatment because they have all had their annual salaries determined through a process which carries forward their salary from the year before provides an inadequate basis for deciding the litigation fate of the many through the claims of a few.

### E.      Compliance with Rule 23(b)

If Plaintiffs had successfully demonstrated the four prerequisites under Rule 23(a), they would still need to show that the circumstances of their case are such that one of the three available options for class certification under subsection (b) of the rule applies. Plaintiffs have asked us to certify a class pursuant to Rule 23(b)(2), because they seek

only injunctive and other equitable relief, and voluntarily commit to assume the

obligation to provide notice and an opportunity for class members to opt-out and litigate

their own claims.  Subsection (c) of Rule 23 covers notice requirements for class actions

and allows a court to require appropriate notice, if necessary, when certifying a class

under Rule 23(b)(2).  Notice is mandatory if a class is certified under Rule 23(b)(3),

where certification also rests on a requirement that common questions of law or fact

predominate.

Plaintiffs' request for injunctive relief theoretically provides them a basis for

avoiding the need to demonstrate that common issues of fact and law predominate over

issues affecting individual class members.  Plaintiffs firmly maintain that class treatment

under Rule 23(b)(2) is warranted because they seek only "equitable relief" and back pay

as equitable remedies under Title VII,[9] but there is nothing in Rule 23(b)(2) approving

certification for cases where "equitable relief" is appropriate for the class as a whole.

Rule 23(b)(2) requires a showing that "injunctive relief or corresponding declaratory

relief" be "appropriate respecting the class as a whole," but "equitable relief" is not

necessarily "injunctive relief."  Consequently, in the absence of a request for injunctive

relief, Plaintiffs would most likely be left to seek certification under section 23(b)(3),

---

[9]*Dicta* in a footnote to a relatively recent Supreme Court decision call into question the
propriety of that assumption. See *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204,
218 n.4 (2002)(Court states that it is a questionable proposition to say that back-pay in a Title
VII case is a form of restitution and all forms of restitution are equitable, because it has never
stated that all forms of restitution are equitable in any past decision).

which necessarily requires them to demonstrate that common issues predominate, a burden they simply can not sustain in this case, where the differences among each putative class member's description of the discrimination to which she was subject are apparent from the sample of affidavits submitted and Defendants' defenses to any gender based salary discrepancy would necessarily differ with each individual class member.

We are not convinced that Plaintiffs' request for the injunctive relief is anything more than an effort to pay lip service to the requirements of section 23(b)(2) in order to avoid the section 23(b)(3) obligation of showing predominance of common issues. The Seventh Circuit has stated that:

> ... just as the presence of a damages claim does not always require insisting that the case proceed under Rule 23(b)(3), so the fact that declaratory or injunctive relief is sought (and no, or only incidental, damages) should not automatically entitle the class to proceed under Rule 23(b)(2). There can be critical differences among class members that are independent of differences in the amount of damages.

*In re: Allstate Ins. Co.,* 400 F.3d 505, 507 (7th Cir. 2005). In *Allstate,* the significant difference among potential class members related to how each had been induced to quit employment. In the case at bar, the differences arise with respect to when and why a particular class member received less in salary than similarly situated male employees. Such factual differences are not amenable to class-based treatment, especially where there is no offsetting evidence that the class, as defined by Plaintiffs, is truly homogeneous.

**IV.    Conclusion**

For the reasons explicated in this entry, Plaintiff's Motion to Strike Defendant's Expert Witness (Doc. #199) is DENIED.  Defendant's Combined Motion to Strike Plaintiffs' Expert (as set forth in their response to the class certification motion) is DENIED.   Plaintiffs' Motion for Class Certification (Doc. #168) is also DENIED. Defendants' two separate summary judgment motions remain pending and the Magistrate Judge shall be requested to confer forthwith with all counsel for purposes of exploring the possibility of an agreed resolution of the named Plaintiffs' individual claims.

IT IS SO ORDERED:

Date:   03/12/2010

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kevin W. Betz
BETZ & ASSOCIATES
kbetz@betzadvocates.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Thomas J. Henderson
HENDERSON LAW FIRM PLLC
tjh@hendersonfirm.net

Jamie A. Maddox
BETZ & ASSOCIATES
jmaddox@betzadvocates.com

Felicia  Medina
SANFORD WITTELS & HEISLER, LLP
1666 Connecticut Ave., N.W. Suite 310
Washington, DC 20009

Hannesson Ignatius Murphy
BARNES & THORNBURG LLP
hmurphy@btlaw.com

Robert Anthony Prather
BARNES & THORNBURG LLP
tony.prather@btlaw.com

David Weissbord Sanford

SANFORD WITTELS & HEISLER LLP
dsanford@nydclaw.com

George A. Stohner
MORGAN LEWIS & BOCKIUS
gstohner@morganlewis.com