UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| SALLY A. RANDALL and RONA C. PEPMEIER, | ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | 1:06-cv-860-SEB-JMS |
| ROLLS-ROYCE CORPORATION, | ) | |
| ROLLS-ROYCE NORTH AMERICA, | ) | |
| INC., ROLLS-ROYCE NORTH AMERICA | ) | |
| HOLDINGS, INC., and ROLLS-ROYCE | ) | |
| NORTH AMERICA (USA) HOLDINGS | ) | |
| CO., | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER ON DEFENDANTS' TWO SUMMARY JUDGMENT MOTIONS**

Plaintiffs, Sally Randall and Rona Pepmeier, each claim to have been the victims

of gender discrimination while employed by Defendants, in violation of the Equal Pay

Act (EPA) and Title VII of the Civil Rights Act.  Defendants are all related entities

engaged in the business of  manufacturing turbine engines and parts and, unless there is a

specific reason to differentiate among them, we will refer to them collectively throughout

this entry as "Rolls-Royce."  In addition to their individual disparate treatment and

disparate impact claims, Plaintiffs initially pled a "pattern and practice " claim, seeking to

represent a class of women employees occupying various high salary management pay

grades at the Rolls-Royce facility in Indianapolis, Indiana.  We denied their class

certification motion in March 2010 and thereafter also denied a motion to reconsider that

decision, leaving Ms. Randall and Ms. Pepmeier to pursue only their individual claims. This entry addresses the two summary judgment motions which Rolls-Royce has filed with respect to the individual claims of each of the Plaintiffs, respectively.

### *Rolls-Royce Employee Compensation Structure*

To fully understand the arguments made by the parties to this dispute, an examination of the Rolls-Royce salary structure and salary setting methodology in place since 2002 is necessary. To that end, we have drawn heavily on the Rolls-Royce Compensation Guidebook, a reference tool for Defendants' Human Resources staff, which guidebook we also referenced liberally in analyzing Plaintiffs' prior motion for class certification.

Employee compensation for non-hourly positions at Rolls-Royce is based on an annual salary plus a bonus awarded through one of the two bonus programs for which the employee may be deemed eligible. The company attempts in setting compensation levels to ensure that its employees receive a market-competitive salary. To accomplish that goal, the company sets salary ranges for each position based on three factors: (1) job level; (2) control point (a/k/a "salary grades"); and (3) geographic differential.[1] There are

---

[1] The geographic differential is not important to this litigation because, with the possible exception of an occasional Indianapolis Rolls-Royce employee who is temporarily stationed elsewhere within the organization, it is the same for all Indianapolis employees, who are the only employees with whom Plaintiffs compare themselves.

a total of eight job levels denominated 70 through 77. Non-supervisory or "individual contributor" jobs are assigned levels within 70 to 75. Supervisory positions are set at levels 72 through 77. Various suffixes are used in job titles to help delineate various job levels. The Compensation Guidebook contains the following helpful chart:

| LEVEL | Individual Contributor | Manager |
|---|---|---|
| 70 | Associate | |
| 71 | Sr. Associate | |
| 72 | Specialist | Supervisor |
| 73 | Sr. Specialist | Manager |
| 74 | Consultant | Sr. Manager |
| 75 | Principal | Director |
| 76 | | Vice President |
| 77 | | Executive Vice President |

To establish specific salary ranges, Rolls-Royce subdivides each of these eight job levels into four control points designated by a letter, which we refer to as "salary grades" in this litigation. Thus, an employee at any job level may be assigned any one of four letter designations, for example: 71A, 71B, 71C, and 71D.

Rolls-Royce sets the salary ranges for each grade following annual reviews of outside market-based employment surveys, which data inform their decisions for each type of job within each salary grade. Salary ranges within job classification levels as well

as within the respective control points can and do vary significantly.  Rolls-Royce also determines a median or midpoint market salary for each salary grade and on this basis pegs the minimum salary for each grade at 75% of the median with a maximum  set at 125%.  Significant overlaps exist between and among the ranges for specific job levels and control points (i.e., an employee working as a 71A, whose salary is set at the higher end of that salary range, could receive more than an employee who works as a 73A).  Thus, an employee's specific salary amount depends on a variety of factors, including the complexity of the employee's responsibilities, the employee's experience level and qualifications, and the quality of the employee's performance.

Rolls-Royce conducts an annual review of every employee's performance, in part to determine whether the employee's performance merits a raise in pay.  Each year Rolls-Royce adopts a budget for merit increases and apportions the budgeted amount to each manager.  Based on this allocation, each manager makes recommendations for increases for their supervisees.  Part of the manager's evaluation process is the computation of a Performance Development Review ("PDR") score for each employee, which informs the decision as to the amount of any merit increase an employee is entitled to receive.  In addition to conducting this annual review process, managers are vested with discretion to determine any appropriate adjustments to an employee's base salary, such as an "equity adjustment," in order to make the salary  commensurate with market levels and reflective of the nature and scope of the employee's duties. Managers are also authorized to make

critical skills adjustments for those top performing employees whose skills are deemed critical to the success of the business.

In addition to receiving an appropriately calibrated salary, employees are also eligible to participate in one of two bonus programs: the All Employee Bonus Scheme ("AEBS") or, upon nomination by managment, the Annual Performance Related Award ("APRA"). The Rolls-Royce Leadership Team for each particular business nominates employees to participate in the APRA program, which is an executive bonus program paid out to recipients on the basis of two-thirds in cash and one-third in deferred stock. APRA awards focus on the employee's performance against personal objectives set at the start of the year. Employees nominated to participate in APRA do so at differing percentage levels assigned based on the significance of their roles within the company. Company financial targets must be achieved for any bonus payment to occur under APRA. Eligibility for APRA is typically reserved for Director-level employees and above. However, exceptions are made from time to time for participation by employees below the Director-level.

Employees not selected for participation in the APRA program are eligible for the AEBS. AEBS awards are based on the company's overall performance relative to certain financial measures.

### *Sally Randall's Tenure*

Sally Randall holds B.S. and M.S. degrees from Purdue University in Mechanical Engineering and Thermal Science, respectively. She initially worked for the predecessor to Rolls-Royce, Detroit Diesel Allison. After the Indianapolis facility was acquired in 1995, she became a member of the Rolls-Royce engineering department, and in April 1996 she attained the level of Chief Project Engineer.

From January 2000 through April 2002, Randall occupied the position of Chief Project Engineer for the Model 250 Engine product family. After requesting an opportunity to transfer to another business section in April 2002, Rolls-Royce moved her to the AE1107 Engine product line, where she assumed a comparable position as Chief Project Engineer. In early 2003, she was approached by the hiring manager for the Quality area and, in March of 2003, Randall accepted the position of Director of Quality Assurance for Rolls-Royce Corporation. She continued in that 75B level position for a couple of years taking on additional duties as acting Vice President of Quality during the period while the permanent employee in that post was on leave. In April 2005, Randall advanced to a grade 75C, when she became Director of Quality Systems and Assessments for Rolls-Royce North America. At the time she filed this lawsuit in May 2006, Randall had recently moved into the Controls business unit to occupy a program management position slotted at the 75D salary level.

Randall claims that, while working for Rolls-Royce, she has consistently made a lower salary than comparably-employed males. In fact, she alleges that this unequal

treatment began during the time she worked for Rolls-Royce's predecessor. Though by deposition she testified that she was unsure which men employees held jobs appropriately comparable to the ones she held after she left the engineering department in March 2003, she has since identified in her summary judgment brief those male employees whom she believes held positions comparable to those positions she held from 2003 through 2007. In support of her claims of discrimination, Randall has also submitted a salary comparison chart.

Randall also contends that her gender combined with the fact that she complained of gender discrimination were the reasons she did not receive certain promotions, maintaining that, despite being the most qualified candidate for the job, she was not considered for promotion in October 2004, when the Chief Engineer position was available in the Helicopters product area. She had registered a complaint regarding her exclusion from the selection process for that position and now alleges that due either to the fact of her complaint or to her gender or both, she was denied the next few positions for which she applied as well, including the Vice President of Quality for Rolls-Royce Corporation. The Vice President of Quality position was created by splitting the then existing Vice President position and assigning the incumbent to serve only as the VP for Rolls-Royce North America. Randall also contends that she was the most qualified applicant for the Chief Engineer position in the F136 Fighter program in June 2005, but again was passed over. Finally, Randall claims that she was more qualified than the male

who was made Chief Engineer in the Defense Engines/EMO division in the summer of 2005.

### *Rona Pepmeier's Tenure*

Following five years of employment with her family's metal fabrication shop, Rona Pepmeier left to attend the University of Pittsburgh, from which she earned a B.S. degree in Applied Mathematics and an M.S. in Industrial Engineering. In 1998, Pepmeier and her husband accepted job offers at Rolls-Royce and relocated to Indianapolis, where she began employment as a Production Systems Engineer.

At the end of 1999, Pepmeier became the Director of Business Improvement and Quality, which position she held (including a similar, re-titled position) until the summer of 2001, when she became the Operations Program Director of 40-Day Engine. Early in 2002, Pepmeier became the Acting Operations Director for Combustion Systems and thereafter the full-fledged Operations Director. She held various level 75C Operations Director positions in several manufacturing areas, including Operations Director for Ops 250 (250 being an engine model) from March of 2004 through late 2005.

When the Operations area was reorganized early in 2006, Pepmeier expressed interest in and accepted a position as a Continuous Improvement Consultant ("CIC"). Initially, she was informed by HR Generalist Mick Knuckles that the CIC position was a 73 level position; however, after Knuckles determined that there was another individual

who was a CIC and slotted at the 74C salary grade, Pepmeier was informed that she, too, would be placed in the 74C salary grade, but that she would no longer be eligible for the APRA bonus program because she would then be an individual contributor as opposed to a manager and no other CIC was a participant in the APRA program. Though her new position was slotted in the 74C salary grade, Pepmeier continued to receive the same salary she had earned as a Director.

In April 2006, Pepmeier applied for the job of Senior Manager Process Excellence, another 74C salary grade position, and was accepted into that position in June 2006. To our knowledge, Pepemeier remains employed in this position by Rolls-Royce in Indianapolis.

While serving as an Operations Director for the M250 engine in 2004-2005, problems arose when production levels fell below the business plan and production schedule targets. Pepmeier was summoned to a meeting with Rolls-Royce Chief Operating Officer Steve Dwyer to discuss these production deficiencies and, following that meeting, Pepmeier complained by e-mail to a Human Resources ("H.R.") representative that Dwyer had acted unprofessionally towards her during the meeting by, among other things: threatening to fire her, discussing his intent to fire her boss, telling her she cared too much about how others viewed her, criticizing the company Vice-President for crediting her with potential for advancement, and accusing her of being a "finger-pointer." Though Pepmeier's allegations included no mention of any behavior or

language on the part of Dwyer which was facially gender-based, she said in her e-mail that she thought she was being discriminated against because of her gender because, as far as she knew, the male Operations Director who had responsibilities within the same area had not been called in for a meeting or been treated in a similar manner. She requested that HR conduct an investigation of her complaints.

Amos Hewitt, Director of Diversity and Employment Practices, was promptly assigned the task of conducting an investigation of Ms. Pepmeier's allegations, concluding that there had been no acts of gender-based discrimination by Mr. Dwyer and that his behavior was merely reflective of his frustration with Pepmeier's department and his perception that she was unwilling to accept responsibility for her part in the production deficiencies. Ms. Pepmeier did not accept Hewitt's conclusion, complaining that Hewitt had conducted an inadequate investigation, given that he had interviewed only her and Mr. Dwyer (she admitted in her deposition, however, that she did not know until "months later" that Hewitt had also spoken to at least one other Operations Director). Pepmeier also called the company's ethics "hot line" to complain about the loud and intimidating manner in which Dwyer had spoken to her and Hewitt's allegedly deficient investigation. In response to her "hot line" complaint, Charles Geisting, the company's Corporate Ethics Manager, contacted Pepmeier who told him that Dwyer had yelled (but not cursed) at her, and that she was unsettled by Dwyer's conduct in approaching her directly with his complaints, rather than discussing them first with her boss. Pepmeier

reported to Geistling that things were improving since the time of Hewitt's investigation, but that she still wanted to make sure that her complaint about Dwyer's conduct was documented.

Ms. Pepmeier claims that she has been the victim of gender discrimination based on pay inequities and that, following her complaint of discriminatory treatment by Mr. Dwyer and her filing of a charge of discrimination with the EEOC on August 5, 2005, she was retaliated against by being removed from participation in the APRA bonus program.

Rolls-Royce denies any discrimination or retaliation against either Ms. Pepmeier or Ms. Randall, and seeks summary judgment on their claims.

### *SUMMARY JUDGMENT STANDARD*

The primary purpose of summary judgment is to isolate and dispose of claims which are bereft of factual support. *Albiero v. City of Kanakee,* 246 F.3d 927, 932 (7th Cir. 2001). Once a party has filed a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings, but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 923 (7th Cir.2001). It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008); *Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the requirements of Rule 56, summary judgment is mandatory. *Celotex*, 477 U.S. at 322-23; *Shields Enterprises., Inc. v. First Chicago Corp*., 975 F.2d 1290, 1294 (7th Cir.1992).

In evaluating a motion for summary judgment, a court must draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996), *cert. denied*, 519 U.S. 1109 (1997). The mere existence of a factual dispute, by itself, however, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *Anderson*, 477 U.S. at 248. Irrelevant or unnecessary facts do not defeat summary judgment, even when in dispute. *Harney,* 526 F.3d at 1104. "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d

1121, 1124 (7th Cir.1996), *cert. denied*, 519 U.S. 1115 (1997).

## *DISCUSSION*

Almost nothing in this protracted litigation has yielded to easy resolution, so we welcome this opportunity to effortlessly and straightforwardly remove from the case two of the named Defendants. As Defendants point out, miraculously without dispute from Plaintiffs, neither Ms. Randall nor Ms. Pepmeier ever worked for Rolls-Royce North America (USA) Holdings Co. or Rolls-Royce North America Holdings, Inc. Accordingly, Plaintiffs can advance no viable claim against either of these companies under Title VII or the Equal Pay Act. *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 203(g). In a similar vein, while Defendant Rolls-Royce North America, Inc. employed Ms. Pepmeier during a time period relevant to this case, it never employed Ms. Randall, so it can not be found liable on any of Randall's claims. Thus, Defendants Rolls-Royce North America (USA) Holdings Co. and Rolls-Royce North America Holdings, Inc., are hereby dismissed entirely from this lawsuit, and Defendant Rolls-Royce North America, Inc. is dismissed insofar as any claims by Ms. Randall are concerned.

### **_Disparate Impact Claims_**

A disparate impact claim requires proof of a facially neutral employment policy or practice which, when implemented, causes an identifiable disparate and discriminatory outcome to members of a protected group. *See Bennett v. Roberts*, 295 F.3d 687, 698 (7th

Cir. 2002). To establish a *prima facie* case of disparate impact, the specific employment practice allegedly responsible for such statistical disparities must first be identified, after which a Plaintiff must establish a causal connection between the specified employment practice and the disparity by offering statistical evidence of a kind and scope sufficient to show the disparate impact on those in the protected group. *Id.*

Plaintiffs' First Amended Complaint sought a recovery based on a disparate impact theory in favor of both the individual and class member claimants. However, neither Rolls-Royce nor Plaintiffs have discussed in their summary judgment briefs the individual claims based on disparate impact. The record reflects the Court's denial of Plaintiffs' class certification motion on March 12, 2010, in large part due to our rejection of Plaintiffs' theory that the "carrying forward" of base salaries from year to year was a policy or practice which disparately impacted women. We rejected Plaintiffs' attempt to isolate this so-called "carry-forward" practice because doing so would ignore the numerous and varied other factors and discretionary considerations which formed the basis of the annual compensation calculations by Rolls-Royce and, further, because there was no admissible evidence of any existing disparity that would have been "extended" by virtue of the "carry-forward" practice. In the end, the commonality element necessary in order for the court to certify a class had simply not been established. Other requirements for maintaining a class action were also missing.

To the extent that Randall and Pepmeier are attempting to pursue their individual

disparate impact claims, summary judgment in favor of Rolls-Royce is again appropriate for essentially the same reasons underlying our decision that a lack of commonality precluded class certification. In brief, there is a complete lack of admissible evidence to establish an existing gender-based disparity on this basis. Further, Plaintiffs' expert conspicuously failed to include all the relevant factors affecting the amount of compensation paid to Rolls-Royce management employees, including Randall and Pepmeier. Thus, no casual link has been established between the use of these plaintiffs' prior year's salaries as the starting point for the ensuing year's salary computations and the receipt by them of lower salaries than certain men received.[2] Plaintiffs' individual disparate impact claims are therefore dismissed with prejudice.

### *Disparate Pay Claims*

Plaintiffs' disparate pay claims are premised on two federal statutes: The Equal Pay Act and Title VII of the Civil Rights Act. The Equal Pay Act prohibits an employer from discriminating against employees on the basis of sex "for equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures

---

[2]For a more detailed discussion of the inadmissible OFCCP press release offered by Plaintiffs in their class certification motion as a basis for establishing the existence of gender discrimination at the start of the relevant time period, as well as our analysis of the shortcomings within the report of Plaintiff's statistical expert, we cite for review our orders of March 12, 2010 (Doc. #224) and May 13, 2010 (Doc. #250).

earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."   29 U.S.C. § 206(d)(1).   Title VII prohibits an employer from discharging or discriminating against an employee "with respect to [her] compensation, terms, conditions or privileges of employment, because of [her] ... sex." 42 U.S.C. § 2000e-2(a)(1).  A *prima facie* case under Title VII requires a showing that: (1) the plaintiff is a member of a protected class; (2) she was performing at a level expected by her employer from one in such a position; and (3) she suffered an adverse employment action, in that she was paid a lower salary than a "similarly situated" nonprotected class member. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 274 (7th Cir. 2004).

Considerable overlap exists between these statutes, but they are generally distinguishable in that Title VII requires proof of discriminatory intent, whereas the EPA creates a type of strict liability so that, if Plaintiffs establish that they were paid less than male employees for work requiring equal skill, effort and responsibility, and the employer is unable to attribute the disparate pay to one of the four statutory affirmative defenses, Plaintiffs will prevail.  *Fallon v. State of Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989).

*Equal Pay Act Claims*

Timeliness of claims:

Rolls-Royce's opening salvo in their motion for summary judgment is that

Plaintiffs' claims under both the EPA and Title VII are untimely. [3]  Claims under the EPA

must be brought within two years, unless it can be shown that Defendant has acted

willfully, in which case the limitations period is extended to three years.  29 U.S.C. §

255(a).  Plaintiffs filed suit here on May 26, 2006, and maintain that the three-year

limitations period applies because Rolls-Royce failed to prevent the recurrence of gender-

based salary inequities after it was put on notice of those inequities by a 1996 Office of

Federal Contract Compliance Programs investigation, which investigation culminated in a

---

[3]Defendants argue that Ms. Randall's deposition testimony conclusively establishes that she has no timely claim of disparate pay under either the Equal Pay Act or Title VII because she does not claim to have been paid less than men in similar positions since leaving the engineering department in March 2003, which was more than two years prior to her filing a charge of discrimination as well as this lawsuit.  We agree, based on her deposition testimony, that the focal point of her dissatisfaction with respect to unequal pay is the time period when she was working in the engineering department.  Nevertheless, her deposition testimony does not completely foreclose any possibility of relief for discriminatory compensation decisions after leaving engineering.

Rolls-Royce cites Randall's testimony given in response to questions regarding the allegations in her charge of discrimination.  She stated that the allegations of unequal pay applied to the entire time period she was in the engineering department, and then she added:  "up until 2003 when I moved into the quality job, which I don't have any knowledge of whether or not I was being paid more or less."  Randall Depo. at pg 28.  She also stated that she believed that she received disparate pay when she move into the quality area, but that she held a position that was so unique that it would be difficult to know which males held comparable positions.  Randall Depo. at pg 23-24.  Since her deposition, Randall now claims to rely on documents and electronic data obtained during discovery, which her expert has reviewed and summarized and which, she says, demonstrate that there were male employees who held positions in the same job level and salary range as Randall, during the years after she left engineering and joined the quality department, who were paid higher salaries.

Randall is entitled to rely on evidence brought to light during the discovery period to advance her claims.  Her lack of personal knowledge regarding which males could be said to be appropriate comparators at the time of her deposition is not a basis on which to bar her claim as untimely.  Her claim may fail for other reasons but, if she can substantiate her claim with admissible evidence obtained as a result of the discovery process and her claim is otherwise timely, her testimony does not bar her pursuit of a disparate pay claim for the time period following her departure from engineering.

fine against the company of nearly a half million dollars, payable as back-pay to 54 female employees.

Regardless of whether "failure to prevent" and "willful" are coextensive, the only evidence offered by Plaintiffs to support their contention of a willful violation is an unauthenticated news release from the U.S. Department of Labor, issued in 1998, which touts an OFCCP compliance investigation and audit agreement entered into between the agency and the predecessor to Rolls-Royce at its Indianapolis facility. Not only does the lack of authentication make the press release inadmissible under Fed.R.Evid. 901, its relevance is highly questionable since no evidence has been adduced to establish the specific compensation policies that were in place at Rolls-Royce's predecessor or how they may or may not have changed thereafter or in what way(s) they are attributable to these Defendants. The record is entirely devoid of any admissible evidence supporting Plaintiffs' claim of a willful violation. Consequently, we hold that Plaintiffs' EPA claims extend back two years from the date of the Complaint, to wit, to conduct occurring on or after May 26, 2004.

Equal Work:

Plaintiffs must show under the EPA that they were being paid less for equal work, but "equal work" is not to be construed under the EPA to mean "comparable work." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1327-1328 (10th Cir. 2004). In order

to prevail in an EPA action, the jobs of women and men for which pay is unequal must be substantially equal in terms of skill, effort, responsibility, and working conditions. *Cullen v. Indiana University Bd. of Trustees*, 338 F.3d 693, 698-699 (7th Cir. 2003). In that regard, both Randall and Pepmeier have failed to establish that they were performing "equal work" to that performed by comparably -employed men. Clearly, nothing in the EPA indicates that it is designed to address disparities in pay between men and women occupying distinctly different upper-level management positions within the hierarchy of a company's administration. The Act is instead aimed at remedying gender-based pay disparities where the work and working environment are homogeneous rather than heterogeneous. *Sims-Fingers v. City of Indianapolis,* 493 F.3d 768, 770-771 (7th Cir. 2007); *see also*, 6 Lex K. Larson*, Employment Discrimination* § 107.06[3] (2d ed.2010)(EPA does not provide a remedy for unreasonably large differentials between similar but unequal work, such as a male inspector whose particular job is only 25% more difficult than a female inspector's, but who is receiving 100% greater pay.)

In *Sims-Fingers*, a female manager of a city park was being paid less than certain male managers, prompting her to file an action under the EPA and Title VII. *Id.* at 769-770. Because of the varied nature of the city's parks and the resultant differences among the park managers' responsibilities, the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the city, *Id.* at 772, in which opinion Judge Posner wrote:

[W]hen jobs are heterogeneous a suit under the Equal Pay Act is in danger of being transmogrified into a suit seeking comparable pay - a theory of liability for sex discrimination under Title VII that has been rejected by this and the other courts to consider it.  *Loyd v. Phillips Bros., Inc*., 25 F.3d 518, 524-25 (7th Cir.1994); *American Nurses' Association v. Illinois*, 783 F.2d 716 (7th Cir.1986); *AFSCME v. Washington*, 770 F.2d 1401, 1406-07 (9th Cir.1985); *Lemons v. City of Denver*, 620 F.2d 228, 228-30 (10th Cir.1980). The comparable-pay movement asks that wages in different jobs be proportional to the differences between the jobs in difficulty, required skill level, amenities, and so forth. Paula England, *Comparable Worth: Theories and Evidence* 1 (1992); *Washington County v. Gunther*, 452 U.S. 161, 166 and n. 6, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *American Nurses' Association v. Illinois*, *supra*, 783 F.2d at 719-20. The concern is that traditional women's jobs, such as secretarial work, are paid less relative to traditional men's jobs, such as driving a truck, than the objective differences between the jobs merit. Liability on the basis of a theory of comparable worth is even less tenable under the Equal Pay Act than under Title VII, because the former Act requires equal pay only for equal work, and the whole idea of the comparable-worth movement is that equal pay should sometimes be required for unequal work.  *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 800-01 (11th Cir.1992); *cf. Wernsing v. Department of Human Services*, 427 F.3d 466, 467-70 (7th Cir.2005); *EEOC v. Madison Community Unit School District*, 818 F.2d 577, 580, 582 (7th Cir.1987). ...

The proper domain of the Equal Pay Act consists of standardized jobs in which a man is paid significantly more than a woman (or anything more, if the jobs are truly identical) and there are no skill differences. An example might be two sixth-grade music teachers, having the same credentials and experience, teaching classes of roughly the same size in roughly comparable public schools in the same school district. *Buntin v. Breathitt County Board of Education*, 134 F.3d 796, 797, 799 (6th Cir.1998); *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1032-35 (11th Cir.1985).

*Id.* at 771-772.


In the case at bar, Randall and Pepmeier have jointly submitted a salary

comparison chart for the years 2003[4] through 2007.  They submit this chart as a

distillation of information "extracted from the information attached as Exhibit C to Dr.

Drogin's Affidavit;" Dr. Richard Drogin is their statistical expert whose affidavit has

been submitted in support of their response to Defendants' summary judgment motions.

Defendants note that Dr. Drogin has not specifically authenticated the comparison chart

itself, only the computer generated data sheets from which the information in the charts is

said to have been extrapolated, and, while their point is well taken, Defendants have not

directly challenged the accuracy of the information contained in the comparison chart.

At least with respect to Ms. Randall, the chart is actually more supportive of

Defendants' position than Plaintiffs.'  The chart shows that from 2003 through 2007 only

two of Ms. Randall's male colleagues worked in the same personnel unit and held jobs in

the same salary grade level as she did at any given time.  Randall earned more than her

male comparator in 2004, and, during 2007, the other comparable male had a salary of

$143,220, while she earned a salary of $143,165.  Obviously, a difference of $55 between

salaries of such magnitude is trifling.  *See id*. at 771; *Brousard-Norcross v. Augustana*

*College Ass'n*, 935 F.2d 974, 979 (8th Cir. 1991)(EPA claim not available where

differences in salaried positions were marginal at best).

---

[4]Though the chart contains salary comparison information for the year 2003, the two-year
limitations period discussed earlier in this opinion limits the relevance of the information in the
chart, for purposes of the Equal Pay Act, to that set out for year 2004 and thereafter.

The salary comparison chart for Plaintiff Pepmeier lists other employees who held Operations Director positions at the same time she did from 2003 through 2006, and reflects that she was at the bottom of the salary range for each year. However, her acknowledgment in her brief and affidavit that each Director was responsible for different products and parts and had varying numbers of employees answering to them at different times seriously undermines her EPA claim. *Pepmeier Aff.* ¶¶ 7-8. In addition, each of the males whose names are listed in the chart had been with the company for at least ten years longer than Pepmeier, another critical deficiency in Pepmeier's claim because seniority is a recognized and accepted defense to a disparate pay claim under the EPA. Defendants have noted other differences between Pepmeier and her alleged male comparators, but we need go no further in our analysis because, clearly, each of these Plaintiffs and the male employees with whom they compare themselves held unique upper-management positions during the time period for which Plaintiffs seek relief, which uniqueness forecloses relief under the EPA.

*Title VII Claims*

Timeliness of Claims:

Rolls-Royce again raises timeliness issues with respect to Plaintiffs' Title VII disparate compensation claims. Before the recent legislative changes affecting Title VII, a plaintiff claiming discrimination in the form of disparate pay could only recover back-

pay for "discrete discriminatory pay decisions" which occurred within a 180 day period (or in some states which share administrative responsibilities with the EEOC, such as Indiana, - a 300 day period) prior to her filing a charge of discrimination. *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 624-25 (2007). In the Lilly Ledbetter Fair Pay Act of 2009, Congress legislatively reversed the Supreme Court decision in *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618 (2007) and retroactively amended Title VII to eliminate any time bar which previously prevented an employee from recovering back-pay for disparate pay resulting from a discriminatory decision occurring more than 180 days prior to that employee's filing a charge of discrimination. Under current law, regardless of the time the discriminatory decision occurred or the discriminatory procedure was adopted, a plaintiff is entitled to recover back-pay for the proceeding two years prior to the date she filed her charge of discrimination, so long as her pay during those two years continued to reflect the employer's discriminatory decision or procedure. 42 U.S.C. § 2000e-5(e)(3)(B). Plaintiffs in the case before us filed their first charge of discrimination on August 5, 2005. Consequently, we hold that Randall and Pepmeier are permitted to seek to recover their back-pay entitlements dating back to August 6, 2003, so long as they succeed in proving that during this two-year period they received lower pay than similarly situated male counterparts as a result of their employers' prior discriminatory acts.[5]

---

[5]Despite their vigorous arguments with regard to the proper interpretation of the Lilly Ledbetter Fair Pay Act on Defendants' timeliness argument, Plaintiffs have not identified any

<u>Similarly Situated Male Employees:</u>

We turn then to the issue of how to properly determine whether, in light of their respective jobs, Plaintiffs' male colleagues were similarly situated to them pursuant to Title VII requirements. The Seventh Circuit, as we have previously noted, has rejected the "comparable pay or worth" theory of relief, which would require that wages reflect any differences in job difficulty and required skills, which Title VII does not require. *Sims-Fingers*, 493 F.3d at 771; *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 524 (7th Cir. 1994). Nevertheless, according to Supreme Court precedent, if a plaintiff is unable to show that

she performs equal work to a comparable male employee as required by the EPA, she may nonetheless recover on a Title VII claim, if she can prove that her employer "intended" to discriminate. *Washington County v. Gunther,* 452 U.S. 161, 166 (1981).

Absent direct evidence of such a discriminatory intent, courts employ the familiar burden-shifting template applied in analyzing Title VII claims. *Warren v. Solo Cuo Co.,* 516 F.3d 627, 630 (7th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). Thus, to prevail on this theory, Randall and Pepmeier must show that they

---

discreet discriminatory pay decisions which predated the 300-day period prior to the filing of their charge with the EEOC. Plaintiffs only reference to an alleged discriminatory practice which predated the 300 day period prior to their filing of a charge is the so-called "carrying forward" of an employee's previous year's salary, which we have previously rejected as an independently identifiable policy or practice.

were paid less than similarly situated males.  *Id*.  An employee is "similarly situated" if the employee is "comparable to the plaintiff in all material respects."  *Id*. at 631 (quoting *Crawford v. Indiana Harbor Belt Railroad Co.*, 461 F.3d 844, 846-47 (7th Cir. 2006)).  No hard and fast formula exists for making this determination; instead we must examine "all relevant factors, including whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisors, and (iv) had comparable experience, education, and other qualifications...," which attributes were also taken into account by the employer in making its compensation decisions.  *Id.*

The same critical failure in Randall's disparate pay claim under the EPA afflicts her Title VII claims.  From 2003 on, there were only two male employees who worked in the same personnel unit and held jobs assigned  the same salary grade level as Randall, and she received a higher salary than one of them and only $55 a year less than the other.  She, accordingly, is unable to establish on the basis of this evidence any entitlement to Title VII relief.

Ms. Pepmeier has identified as similarly situated males to her those who held Operations Director positions at the same time she held a similarly titled position.  She has identified  three or more comparators for each year between 2003 and 2006, totaling six individual co-workers.  According to the affidavit of Paul Carter, who was Vice-President of Business Operations for Rolls-Royce from April 2002 through August 2005, Pepmeier and her six identified comparators (David Mair, Shaun Cashin, David Smith, Jim Wright,

Kent Duncan and Russ Vogel) shared similar reporting hierarchies that ultimately led up to him as the Vice President.  He thus opined by affidavit: "I consider these individuals to be her direct comparators."

The fact that Mr. Carter views these employees as Pepmeier's "comparators" does not transform that conclusion into an undisputed fact, since the Court must resolve this issue as a legal conclusion as well.  Thus, we shall attempt to determine whether there are material distinctions between these individuals and Ms. Pepmeier which legitimately account for the males  receiving higher salaries than she was paid.

Rolls-Royce contends that, despite their similarly titled positions, these six individuals were Operations Directors for different product areas, with different budgets and differing numbers of employees under supervision.  According to Rolls-Royce, each of the Operations Directors had significantly different duties and responsibilities as well.  Rolls-Royce also maintains that, while these six individuals may have held jobs within the same pay level and grade as Plaintiff, each had been with the company for considerably longer tenures  than had Pepmeier and, based upon their seniority, job responsibility and experience, they were paid higher salaries within the established salary range.  A review of the experience and credentials of each of the six employees to whom Pepmeier compares herself confirms that their circumstances were different in numerous ways, the most significant of which was their respective lengthy tenures with the company.  As to these factual distinctions, Pepemeier has interposed no real opposition, arguing only as to their

significance.

Shaun Cashin held a Director level position at the Indianapolis plant in 2004 and 2005, but was at the Indianapolis plant on temporary assignment from the Rolls-Royce facilities in the United Kingdom working under a two-year "assignee contract," one provision of which contract authorized his participation in the APRA bonus program. Cashin has seventeen more years with Rolls-Royce than does Pepmeier. In 2004, his salary was $121,086, while Pepmeier's was $115,700. In 2005, his salary rose to $129,407, while Pepmeier's increased to $120,300.

David Mair's tenure with Rolls-Royce is twelve years longer than Pepmeier's and he earned between $15,000 and $20,000 more in salary than she did from 2004 through 2006; the difference between their two salaries diminished slightly over that time period. Mair occupied an Operations Director position during this time, and his responsibilities included overseeing Transmission Operations, which division provided transmission parts for all engines, as opposed to a single engine product line. Mair was also responsible for supervision of approximately twice the number of employees reporting to Ms. Pepmeier, and Mair's employees were spread out over 15 separate departments. In 2006, following the reorganization which placed Pepmeier in the role of a CIC, Mair became a Program Manager for the Operational Excellence Organization. Both of these positions were slotted at level 74C, which was a demotion for Mair and Pepmeier from their prior 75C level Director positions. However, Mair remained eligible for the APRA bonus program,

whereas Pepmeier did not.

James Wright's work with Rolls-Royce began in 1974, twenty-four years prior to Pepmeier's start date with the company. He held a Director level position in 2004 as Production Planning Operations Director, earning a salary of $137,700 within a level and grade designation of 75B. Not surprisingly, his 30 years with the company put him near the high end of the 75B salary scale. He was responsible for Logistics personnel and operations throughout all of the Rolls-Royce Indianapolis manufacturing operations and did not report to the same intermediate supervisor as did Pepmeier, Cashin and Mair. He moved to the Operations Director job for Compressors in 2005, which position was slotted at 75C, for which he earned a salary of $141,800, which was increased to $147,100 in 2006, after he accepted a 74C Manufacturing Manager position. He, too, was allowed to remain in the APRA bonus program after taking the 74C position in 2006.

Russ Vogel, like Wright, has twenty-four years more seniority than Pepmeier. She claims he was similarly situated to her in 2003 and 2004, when he held Director level positions. Vogel's salary was $123, 427 in 2003, and $128,376 in 2004, as Operations Director for Assembly and Test. He reported to the same supervisor as Pepmeier until 2005, but his responsibilities were, undeniably, distinguishable from hers.

Ms. Pepmeier claims David Smith was also similarly situated to her in 2003 and 2004. Mr. Smith has been with the company fourteen years longer than Pepmeier. As

Operations Director for Compressors, earning $113,751 in 2003 and $117,200 in 2004, he reported to the same supervisor as did Pepemeier, but had significantly greater responsibilities and supervised a larger number of employees than she did.

Finally, Pepmeier compares herself to Kent Duncan for the years 2004 and 2005. Duncan became an Operations Director in August 2004, assuming responsibility for directing Turbine operations. He received a salary of $121,500 in 2004, and $125,100 in 2005, after being awarded the highest overall ranking of Operations Directors by his peers. Though he reported to the same supervisor as did Pepmeier, his responsibilities included overseeing a larger budget and a greater number of employees than did Pepmeier. He also had ten years more experience with Rolls-Royce than Pepmeier, but like Pepmeier, Mair and Wright, was reduced to a 74C position when the 2006 Operations reorganization occurred. He remained eligible for the APRA program, despite this demotion.

Our review of these six allegedly comparable employees convinces us that, based on their respective experience and tenure levels alone, none of them, for purposes of salary comparison, is in fact comparable to Pepmeier in all material respects. Pepmeier maintains that there is nothing in the Rolls-Royce Compensation Guidebook (published for reference by HR staff) which designates seniority as a factor in determining individual salaries. While it may be true that the word "seniority" does not appear as such in the Guidebook, the Guidebook does provide that a person's qualifications, scope of responsibility and performance all effect the salary that he/she will receive, and obviously

an employee's length of service translates into a higher level of experience and superior qualifications relevant to their job performance.  In any event, nowhere in the Guidebook does it state  that seniority should <u>not</u> play a role in the annual determination of salary.

Even if we were to find that tenure with the company was immaterial to an employee's salary determination, Pepmeier is still left with a claim that cannot be proven because of the absence of essential job-related similarities.  Pepmeier freely admits that she and the alleged comparators she has identified were all responsible for different product areas, production requirements and management of varying numbers of employees.

Judge Posner's admonition that "Title VII does not require equal work, but neither does it allow for recovery on the basis of the theory of comparable work" clearly applies to our analysis.  *Sims-Fingers,* 493 F.3d at 772.  Pepmeier essentially claims that she performed comparable work for less pay; as such, her claim does not entitle her to a recovery under Title VII.  And, as we have held, Ms. Randall has been unable to identify at all any comparable male employees to her who were paid higher salaries than she received.

<u>Pretext:</u>

If we were to take Ms. Pepmeier's Title VII disparate pay claim a step further, by assuming *arguendo* that she has successfully demonstrated a *prima facie* case, she would

still be required to respond to Rolls-Royce's asserted nondiscriminatory basis for paying the six male employees higher salaries than she received, specifically, that their scope of responsibility, experience and seniority entitled them to higher pay. To succeed, a plaintiff must adduce evidence to show that the cited reasons by the employer are pretextual. *See Kodl v. Board of Educ. School Dist. 45, Villa Park*, 490 F.3d 558. 562 (7th Cir. 2007). The burden falls on Plaintiff to show that the reasons articulated by Rolls-Royce are not true, indeed, that they are lies. *Abioye v. Sundstrand Corp.,* 164 F.3d 364, 368 (7th Cir. 1998). Regardless of whether Defendants' proffered reasons are fully consistent with their company practices generally or their stated policies (and we have found that they are), as long as their reasons for certain actions challenged by a plaintiff are not gender-based, a plaintiff cannot prevail.

Pepmeier's protest that, in properly assessing "experience" and "qualifications," Rolls-Royce should have taken into account her greater educational background (an assertion she makes without citing any supportive facts in the record to establish a lesser educational achievement level for any of the males) does not suffice to establish that Rolls-Royce did not honestly believe that it was paying higher salaries to these six male employees based on their respective greater experience levels and longer tenures. Ill-considered or unfair reasons, so long as they are the true reasons, make no difference in this analysis. *Id.* Pepmeier has offered no admissible evidence which rebuts or otherwise casts doubt on the reasons Rolls-Royce has given for paying the salaries they did to each

of the six male comparator employees.

*APRA Bonus Program:*

We examine separately Pepmeier's claim with regard to her removal from the APRA bonus program in connection with her demotion to a CIC position in early 2006, which occurred as part of the restructuring of the Operations area. She claims that she was removed from APRA either because of her gender or in retaliation for her complaints of discrimination in connection with Steve Dwyer's treatment of her during the conference he held with her about various production deficiencies during the summer of 2005. Pepmeier points to Messrs. Mair, Wright and Duncan as males who, like her, were level 75 Directors and were demoted to a 74C level position as a result of the reorganization, but were allowed to continue on in APRA.[6]

Wright and Duncan remained in the new Operations organization, accepting Manufacturing Manager positions which required them to supervise other employees. They both remained eligible for APRA. Like Pepmeier, Mair sought to leave the Manufacturing Operations organization when it was being reorganized, agreeing to accept a Program Manager position in a new group which would be looking at operations

---

[6]Rolls-Royce contends that we should dismiss Pepmeier's claim because she has no personal knowledge of, and failed to point to, evidence in the record that would support her assertion that these four men continued to receive APRA after they were demoted following the 2006 reorganization and demotions. However, Rolls-Royce has admitted these facts in their briefs to the Court, negating any requirement that Pepmeier independently establish such circumstances. *See Woods v. City of Chicago*, 234 F.3d 979, 989 (7th Cir. 2000).

strategy.  Though it was originally slotted as a 74C position and intended to be a supervisory position, Mair did not immediately supervise others and in April 2006 Rolls-Royce reevaluated the salary grade assignment and moved the position to a 74B grade, also reducing the level of Mair's participation in APRA.

Rolls-Royce contends that the scope of responsibility associated with Mair's new position was considerably greater than Pepmeier's role as a CIC, and that Pepmeier's ineligibility for APRA reflected the fact that no other person holding a CIC position received APRA.  In addition, unlike Pepmeier's responsibilities, Mair's new position included duties with respect to the entire Indianapolis facility's performance and production as well as ensuring that there was communication between and among business leaders internationally.  Rolls-Royce intended Mair's new duties to include leading a team which would define various scenarios and model financial impacts so as to make recommendations for creating a more cost competitive facility.

Pepmeier premises her claim of gender discrimination respecting her removal from APRA eligibility on the indirect method of proof.  In order to establish a *prima facie* case using the indirect method of proof,  Pepmeier must establish that:  (1) she belongs to a protected class; (2) her performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated others not in her protected class received more favorable treatment.  *Moser v. Indiana Dept. Of Corrections,* 406 F.3d 895, 900 (7th Cir. 2005).  Elements one, two and three are not disputed, but Rolls-

Royce again argues that the male employees who remained eligible for APRA were not similarly situated to Pepmeier because they had been moved to positions of greater responsibility than Pepmeier's new role entailed.

We think there is a valid distinction between comparing jobs for purposes of determining salary disparity on the one hand and for purposes of determining APRA bonus program eligibility on the other. Pepmeier is not contending that she should have received an equal or larger bonus; she is asserting that but for Defendants' discriminatory animus and actions, she would have been allowed to remain in the APRA program like the other male Directors, who also were dropped from the 75 salary level down to a 74C level and grade. Rolls-Royce represents in both its brief and its Guidebook that, generally speaking, employees at the Director level (which equates to a salary level of 75 using the chart from the Guidebook) and higher are eligible for inclusion in APRA, but that exceptions sometimes permit certain level 74 employees into APRA. Here, only males who moved from level 75 to level 74 were allowed the benefit of such exceptions. This is enough to satisfy the elements of Pepmeier's *prima facie* case of gender discrimination.

Pepemeier has not succeeded in establishing a *prima facie* case of retaliation, however, with respect to her removal from the APRA bonus program. To prove retaliation under the direct method, she must provide evidence of a causal connection between her engaging in protected activity and her not being included in the APRA program when she move to the CIC position. *Jones v. Res-Care, Inc.* 613 F.3d 665, 671 (7th Cir. 2010). To

prove retaliation indirectly, she must establish that: (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* Implicit in both the direct and indirect schemes of proof is the necessity of showing that the decision-maker had knowledge of plaintiff's having engaged in some form of protected activity, for without knowledge of such protected activity there can be no showing of an intent to retaliate. *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 668 (7th Cir. 2006); *Durkin v. City of Chicago,* 341 F.3d 606, 614-15 (7th Cir. 2003). This is where Pepmeier's retaliation claims fail.

To begin with, nothing in the record establishes the identities of the individual members of the leadership team. Thus, it is impossible to know if any one or more of them had knowledge that Pepmeier had filed an EEOC charge in August 2005 or lodged complaints about Mr. Dwyer's conduct towards her earlier that summer, at the time the leadership team decided to withdraw or not renew Pepmeier's nomination to the APRA program once she became a CIC. Proof that the decision-makers have of Pepmeier's engagement in protected activity cannot be established by inferences or assumptions; there must be evidence to prove that fact. *See Tomanovich,* 457 F.3d at 668; *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005). Because Pepmeier has failed to make such a showing, her retaliation claim fails at the *prima facie* stage.

In response to Pepmeier's *prima facie* showing of gender discrimination in connection with her removal from APRA, Rolls-Royce is obligated to provide a nondiscriminatory reason for not keeping her in that program after her move to the CIC position. Rolls-Royce offers a two-part explanation: first, that Mair, Wright and Duncan held positions of much greater responsibility and, second, that no one holding a CIC position had been included in the APRA program.

In response to the nondiscrimnatory reasons cited by Rolls-Royce, Pepmeier must establish that these reasons are untrue and as such a pretext for gender discrimination. Other than noting that Mair did not supervise other employees in his new role following the reorganization, Pepmeier does not offer evidence to show that Mair, Wright and Duncan's responsibilities were not greater than hers or that the leadership team making the APRA decision did not believe the job responsibilities of these three employees were greater than Pepmeier's following the reorganization.

Pepmeier does refute Rolls-Royce's proffered nondiscriminatory reason for her removal from APRA, namely, that no one else occupying a CIC position was included in the APRA program, identifying Jennifer Settles and Judy Lasley as employees who held similar CIC positions to hers at salary grade 74C and who were participants in APRA. By affidavit, Settles confirms her participation in APRA as a CIC and, by copy of an email chain, the Rolls-Royce HR department appears to acknowledge that Lasley was a CIC

participant in APRA as well.[7]

The referenced e-mail communication chain covers two days during the first week of April 2006, which time period was more than a month after Pepmeier assumed her role as a CIC. This exchange between HR personnel includes a discussion of certain individuals, including Settles and Lasley, who hold CIC positions and whether their current job codes and titles are accurate, whether they are individual contributors or managers, and whether they have been selected to participate in APRA. The e-mail chain certainly seems to confirm that both Settles and Lasley held CIC positions and both were participating in APRA. In addition, it appears that there may be another CIC, Teri Burton, who was removed from APRA two years previously, but who had recently returned to the program. In fact, one HR official participating in the email discussion stated that "we all know there is absolutely no problem" putting a CIC into APRA.

However, the e-mail chain makes equally clear that whatever the reasons were for

---

[7]Pepmeier actually submitted Settle's affidavit and the e-mail chain as evidence to support her claim of retaliation, claiming, without any additional proof, that Settles and Lasley were examples of individuals who had not engaged in protected activity but were allowed to participate in APRA while holding a CIC job. We have previously ruled that Pepmeier's retaliation claim fails for lack of proof of decision-maker knowledge. That claim would also likely fail based on Pepmeier's lack of proof that Settles or Lasley had not complained of discrimination or engaged in some other protected activity. *See Rogers v. City of Chicago,* 320 F.3d 748, 755 (7th Cir. 2003). Nevertheless, Pepmeier also contends that the inclusion of Settles and Lasley in APRA is evidence that one of Roll-Royce's stated reasons for her being dropped from APRA is not true. We address the Settles affidavit and the HR e-mail chain therefore as part of the analysis of Pepmeier's attempt to prove gender discrimination under the indirect method.

Pepmeier's exclusion and other female CIC's inclusion in APRA, they were not gender-based. Further, these emails disclose that there had apparently been failures or delays in coding critical data which would have allowed Settles and Lasley to have been identified as holders of CIC positions and participants in APRA. Finally, the emails demonstrate concern on the part of HR staff that greater consistency was needed generally in identifying the various jobs and responsibilities and assigning accurate job level designations as well as correlating them to eligibility standards for participation in APRA.

In the end, based on the undisputed material facts, no jury could conclude that there had been gender-based discrimination or retaliation in connection with Pepmeier's removal from APRA. At most, a jury might conclude that Pepmeier was excluded from participation in APRA because of the mistaken belief by Rolls-Royce officials that other employees holding CIC positions had not been eligible for the program. Even so, an employer's mistaken belief does not equate to a showing of pretext or discrimination. *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005-1006 (7th Cir. 2001). In any event, the uncontested differences between Pepmeier's CIC job responsibilities and the positions held by Mair, Wright and Duncan support Rolls-Royce's non-discriminatory basis for its decision to deny Pepmeier eligibility for APRA benefits. Pepemeier's claims of gender discrimination and retaliation relating to the APRA-based allegations cannot escape summary judgment.

### *Additional Disparate Treatment Claims*

In addition to their disparate pay claims, both Plaintiffs allege in their First Amended Complaint that they fell victim to intentional gender discrimination in connection with promotion and demotion decisions.

*Pepmeier's Additional Claims*:

Based on her deposition testimony, Rolls-Royce identified Pepmeier's additional discrimination claims as:

1. Initially being offered the CIC position at a 73C salary grade instead of the 74C level.
2. Not being offered a raise when she moved to Senior Manager in June 2006.
3. Her information was left off a quarterly organizational chart printed sometime in late 2006 or early 2007.
4. Failure to be promoted or moved to the Business Improvement Director position and an Operations Director position due either to gender discrimination or retaliation.

Having identified these claims, Rolls-Royce lays out the relevant facts and legal arguments in an effort to secure summary judgment as to each of them. Pepmeier has offered no response to any of these arguments. As a consequence, she has forfeited them. As we have previously noted in discussing the summary judgment standard, the non-moving party may not simply rest on her allegations or expect the Court to search the record for a reason not to grant the motion; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies to defeat the motion. *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008). These claims shall each be dismissed.

*Randall's Failure to Promote Claims*:

Randall challenges several decisions by Rolls-Royce when she was denied promotion to open positions, in violation of Title VII. The evidence adduced in this context discloses that Rolls-Royce engineering groups most often utilized the HRM process in filling positions in the 74 and 75 pay levels. The HRM process involves the creation of a list of internal candidates by a group of supervisors and other interested officials affected by the position to be filled. That group evaluates the candidates to determine which of them are most qualified to fill an open position. The HRM process requires the group to rate and rank the candidates to determine who will be interviewed for the open position. Sometimes the HRM process involves a succession plan. On four or five occasions, Ms. Randall, herself, participated as a reviewer in this hiring process. Randall also was involved on occasion when the hiring manager for a particular position had provided a succession plan to the group for its consideration. In addition to the HRM process, the company would also accept applications from employees who learn of an opening on the company's internal website.

Randall first contends that she should have been awarded the Chief Engineer for Helicopters position during the fall of 2004. She claims that she was first made aware of the availability of this position by someone who had been involved in ranking the internal candidates for the position and who told her of his surprise that she had not been on the

list.[8]  Randall accessed the Rolls-Royce internal website and, having determined that the job opening was still posted, she immediately applied by sending in her resume' to the hiring manager.  The hiring manager promptly responded indicating that a candidate had already been selected to fill the spot.

Upset that she apparently had not been included on the list of qualified internal candidates, Randall contacted HR to inquire as to the reason she had not been considered for the job.  Jeff Handy, the  HR representative charged with the responsibility for organizing the candidate review process, responded that Randall had not timely applied for the job, to which she responded that she had not seen the posting. Randall next complained to her boss, Deborah True, while continuing to press the matter with Handy that she should have been identified as one of the most qualified individuals for the job.  Handy promised to look into the situation, but before he could do so, he left on a previously scheduled vacation.  In Handy's absence, Randall sent an email to another  HR representative suggesting there had been an "ethics violation" in connection with the selection process.

In a subsequent conversation with Randall, Handy informed her that he had been in error when he told her that she had not been considered for the position, because, in fact, she had been.  According to his affidavit, which was submitted by Defendants, ten

---

[8]Randall admits that weeks later that person apologized to her and stated he had been mistaken and that she actually had been on the list.

candidates were initially identified by the managers conducting the HRM process.  Later, but prior to the detailed evaluation and scoring of the candidates, one person was removed from the list, and Randall and two others were added as candidates.  Because Handy allegedly made this explanation without making direct eye contact with Randall, she believed he had fabricated that information.  Handy, nonetheless maintains that Randall had been scored along with the other candidates and that her score placed her in eighth position.  Therefore, she was not included as one of the three candidates the HRM group interviewed.

Despite having not worked in Helicopters since 2002, Randall opines that she nonetheless was the most qualified person for the Chief Engineer position.  After interviewing the three highest ranked candidates, one of whom was a woman, the hiring manager, Scott Crislip, selected Ross Belloni to be Chief Engineer.  Belloni was already working in the Helicopters area and, according to Crislip, he selected Belloni primarily based on Belloni's recent experience and the quality of relationships he had established with the team members within Helicopters. Crislip testified that, while he conducted the interviews and made the hiring selection, he did not participate with the HRM in the scoring process and was not contacted by Randall about the opening until after his decision to place Belloni in the position had already been made.

In 2005,  the Chief Operating Officer of Rolls-Royce, Steve Dwyer, decided that the company should divide the Vice President of Quality position into two positions:  VP of Quality for Rolls-Royce Corporation, and VP of Quality for Rolls-Royce North America.

Deborah True, to whom Randall reported, held the existing combined position and was moved into the VP position for Rolls-Royce North America (though she left Rolls-Royce later that year).  Though not the hiring manager assigned to fill the remaining VP slot, True was directed by Dwyer to interview William Kleiner, a Vice President in another department, for that position and he eventually was awarded the job.  Following her interview of Kleiner, True reported that he had the requisite Quality experience and skills for filling the Quality VP position, but made no specific recommendation.  True was not asked to interview any other candidate.  In connection with this litigation, True has stated by affidavit that in her view Randall also had the basic experience and Quality skills to fill the VP position and that, in fact, Randall had a broader background in the Roll-Royce Quality system, having filled in for True while she was on leave.

Kleiner was offered the position after having been interviewed by Dwyer, Ms. True, and HR Manager Megan Fowler, all of whom offered favorable comments about his selection; he began work in this position in March 2005.  At the time Kleiner was selected, he had twenty years of experience, and this move represented a lateral change for him, as opposed to a promotion.  Ms. True never recommended that Randall fill the position.  Randall contends that she was not promoted to the Vice President position either because of her gender or because she complained about the process followed by the company in filling the position of Chief Engineer for Helicopters.

Having been unsuccessful in landing the Chief engineer for Helicopters, in  June

2005 Randall applied for the position of Chief Engineer for the F136 Joint Strike Fighter

Program.  This time, the HRM process identified Randall on the initial list of internal

candidates to be considered.  In fact, she was ranked number three of the five internal

candidates, all of whom were interviewed for the position.  Tom Hartman, the Director of

this new program and the official responsible for making the hiring decision for the Chief

Engineer position, stated in his affidavit in support of Defendants' motion:

> After a review of the experience, skill set and interviews of each candidate, I
> chose Mark Rhodes, who at the time was a chief engineer on another
> program.  Mr. Rhodes had a considerable engineering background and
> possessed superior technical skills and proven leadership on a similar project.
> These qualities made him an ideal choice for the position and the strongest
> candidate.

Rhodes's duties as Chief Engineer for the new fighter jet project began in August 2005.

Though Randall had not been employed in the engineering area since 2003, she

asserts in this litigation that she was more qualified for the Chief Engineer position than

was Rhodes.  She admits that his experience level a Chief Engineer was comparable to

hers, and that he possessed the additional strength of having prior experience in defense

products.  Nonetheless, in her opinion, her advanced degree as well as her experience in

placing a greater number of products out into the field and in handling product liability

claims should have given her the edge.  She believes she was denied this position again

either because of her gender or because of her ongoing complaints with regard to the way

in which the Helicopters position was filled.  HR's feedback to Randall following Mr.

Rhodes's selection revealed that management viewed her lack of recent engineering

experience and lack of familiarity with the "earned value" system as deficiencies in her qualifications.

When Mr. Rhodes took the Chief Engineer position for the F136 Joint Strike Fighter Program, his position as Chief Engineer for Defense Engines/EMO came open. Randall applied for that opening and was interviewed by three individuals: Dennis Jarvi, President of Defense North America; Norm Egbert, Vice President, Engineering & Tech; and Doug Dean from Human Resources. The person selected for this position would be responsible for leading all engine engineering and design activities for Defense North America and would also participate in support activities for its Safety Review Board.

Mr. Jarvi picked Matt Weimer to fill the position, opining that Weimer had an impressive product design and development background and had shown superb managerial skills in high budget areas with high pressure. Weimer had been with Roll-Royce since 1985 and had a wealth of upper management experience in overseeing large numbers of employees in Engineering, Purchasing, Logistics, and Quality. He had also served as Global Director for Controls and Transmissions while on an international assignment. In Jarvi's opinion, Mr. Weimer was the most qualified applicant for the position.

Admitting that she lacked knowledge as to the factors considered by Mr. Jarvi in deciding to appoint Weimer to be Chief Engineer for Defense Engines/EMO, Randall claims it was clear during the interview that Jarvi had no intention of picking her. Because

Weimer had three fewer years of seniority with the company and thus less direct experience compared to her, Randall viewed Weimer as clearly less qualified for the position. A number of years previously, she had supervised Weimer and in 2007 had an opportunity to observe his performance following his appointment to the Chief Engineer position, and she had found his work lacking. Randall also believes she performed more significant job responsibilities than had Weimer at the time he was selected, given her responsibilities for developing a quality team to conduct audits and training throughout Rolls-Royce North America. Randall also cites the fact that she had received the highest rating used by the company in assessing overall performance during her most recent two reviews, though she did not know what rating Weimer had received.

Randall's explanation again fails to satisfy the requirements for making out a *prima facie* case either with respect to either her retaliation or her gender discrimination claims. With respect to retaliation, she lacks any evidence that any of the decision makers was aware of her having engaged in any protected activity. Even if she could show that a decision maker was in fact aware that she had previously complained, her complaint was limited to a vague claim of possible "ethics violations," not of gender discrimination, which would likely have qualified as protected activity. *See Durkin,* 341 F.3d at 615 (vague complaints that did not speak directly of harassment insufficient to support a retaliation claim); *Fox v. Eagle Distributing Co., Inc.*, 510 f.3d 587, 592 (6th Cir. 2007)(vague allegation that manager was "out to get him" was insufficient to constitute

engaging in protected activity).

Randall's reliance on the indirect method of proof with respect to her gender discrimination claim, due to the absence of direct or circumstantial evidence sufficient to utilize the direct method, is also unavailing. The primary weakness in Randall's claims is that she assigns the Defendant's failure to promote her to what she regards as the company's failure to acknowledge her superior qualifications and value to the company. However, Rolls-Royce has articulated specific nondiscriminatory reasons for its selections of persons to fil each job. A plaintiff's personal subjective opinion that she possesses a superior work record or skill set is not enough to establish pretext. *Johnson v. Nordtrom, Inc.,* 260 F.3d 727, 733 (7th Cir. 2001). The only basis on which she challenges the veracity of the nondiscriminatory reasons proffered by the Rolls-Royce decision makers is Randall's speculation that somehow a discriminatory animus was involved. Randall's difficulty here is that she must show that she possessed more than skills which were comparable to those chosen instead of her; she must show her qualifications were clearly superior.

> [W]here an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext "unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." Deines, 164 F.3d at 279. In other words, "[i]n effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.' " *Byrnie*, 243 F.3d at 103 (quoting *Deines*, 164 F.3d at 280-81).

*Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1180-81 (7th Cir. 2002).

Randall's case falls short of this goal. Though she toots her own horn, she does not deny the qualities and skill sets possessed by each of the successful candidates according to the views of the Rolls-Royce decision makers. In fact, her deposition testimony most often suggests that she was equal to her competition as opposed to being the superior candidate for any of the jobs she sought. While her frustration and disappointment are apparent and understandable, it is appropriate to assume that many other applicants for these positions must also have been similarly disappointed. There is simply no basis on which a jury could reasonably conclude that Rolls-Royce's decisions were based on Randall's gender or on the fact of her complaints regarding the process followed by Rolls-Royce in filling the first job opening.

## *Conclusion*

For the reasons explicated in this entry, Defendants' Motion For Summary Judgment (Doc. #127) pertaining to the claims of Sally Randall is GRANTED and Defendants' Motion For Summary Judgment (Doc. #130) pertaining to the claims of Rona Pepmeier is GRANTED as well.

IT IS SO ORDERED.


Date:  09/22/2010

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Kevin W. Betz
BETZ & ASSOCIATES
kbetz@betzadvocates.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Carolyn I. Hahn
SANFORD WITTELS & HEISLER, LLP
chahn@swhlegal.com

Thomas J. Henderson
HENDERSON LAW FIRM PLLC
tjh@hendersonfirm.net

Jamie A. Maddox
BETZ & ASSOCIATES
jmaddox@betzadvocates.com

Felicia  Medina
SANFORD WITTELS & HEISLER, LLP
fmedina@nydclaw.com

Hannesson Ignatius Murphy
BARNES & THORNBURG LLP
hmurphy@btlaw.com

Robert Anthony Prather
BARNES & THORNBURG LLP
tony.prather@btlaw.com

David Weissbord Sanford
SANFORD WITTELS & HEISLER LLP
dsanford@nydclaw.com

George A. Stohner
MORGAN LEWIS & BOCKIUS
gstohner@morganlewis.com